Curley, J.
I tried this case, jury waived, on November 29 and 30, 1999. At the parties’ request, I permitted the submission of briefs thirty days after the trial transcripts were delivered, and pursuant to their agreement I heard oral arguments on April 24, 2000. What follows are my findings of fact, rulings of law, and order.
I. FINDINGS OF FACT
The plaintiff Merit Oil of Massachusetts, Inc. (“Merit”) is a Massachusetts corporation with its principal place of business in Pennsylvania. The defendant Country Bank for Savings ("Country Bank”) is a state-chartered mutual savings bank incorporated in Massachusetts with a principal place of business in Massachusetts. Merit owns real properly at 80 St. James Boulevard, Springfield, Massachusetts (the “Merit Property”) on which it operates a gasoline station. Merit acquired that land in 1971 and began operating its gas station there the following year. Adjacent to the Merit Property is real property at 1003 St. James Avenue, Springfield, Massachusetts (the “Lapides Property”).
On October 22, 1984, Hartford Realty Trust conveyed the Lapides Property to Howard A. Baer and Dianne S. Baer (“the Baers”). On October 10, 1989, Country Bank lent the Baers $224,000. In connection with that loan, the Baers executed a promissory note for $224,000 and conveyed a mortgage on the Lapides Property to Country Bank. Exhibit 3, tab 1. The Baers operated a dry cleaning business on the Lapides Property through a separate corporation, H&D Unlimited, Inc., d/b/a Lapides Cleaners (“Lapides”).
Releases of petroleum hydrocarbons and chlorinated solvents have contaminated both the Merit Property and the Lapides Property. The Massachusetts Department of Environmental Protection (“DEP”) learned of the petroleum hydrocarbon contamination in 1987, and of the solvent contamination in 1988. DEP issued a notice of responsibility to Merit based on the release of gasoline at or from the Merit Property. DEP also issued notices of responsibility to Lapides and Kang El Lee Realty Corporation based on the release of chlorinated solvents at or from the Lapides Property. DEP never issued a notice of responsibility to Country Bank with respect to any contamination at either property. Merit undertook response actions to assess and remediate the contamination at the Merit Property beginning in 1988, and is continuing to do so.
On March 28, 1991, Merit tiled civil action number 91-491 against the Baers and Lapides in Hampden County Superior Court, alleging that the activities at Lapides had contaminated soil and ground water beneath the Merit Property, and seeking environmental response costs and damages. On April 3, 1991, the Baers filed a joint petition for relief under Chapter 11 of the U.S. Bankruptcy Code (Chapter 11 Case Number: 91-40814). Exhibit 3, tab 2, page 1. On July 23, *251 1991, Merit filed a proof of claim in. the Baers’ Chapter 11 proceeding, asserting that it had expended approximately $200,000 to clean up contamination caused by the Baers. Id. page 2. Merit further claimed that it was entitled to priority treatment of its entire claim because its clean-up expenditures would confer a benefit on the Baers’ estate. At least by September 25, 1991 counsel for the Baers, Merit, and Country Bank had discussed resolving by agreement the financial and environmental issues surrounding the Lapides Property in light of the Baers bankruptcy filing. Exhibit 3, tab 3.
On October 16, 1991, Cold Springs Environmental Consultants, Inc. (“Cold Springs”) sent two “scope of services” proposals to the Baers’ counsel. Exhibit 3, tabs 4 and 5. The first, labeled a “Chapter 21E Phase I Limited Environmental Site Assessment,” exhibit 3, tab 4, offered to do the outlined work for a cost not to exceed $4,850, and sought a 50% retainer to begin the work. Exhibit 3, tab 4, page 4. The second proposal, labeled “Phase II cost estimate," offered to do the outlined work for a cost ranging from $14,300 to $22,700 plus a $1,600 “Waiver of Approvals” fee. Exhibit 3, tab 5, pages 2-3. The Phase II cost estimate therefore totaled between $15,900 and $24,300.
Negotiations among the Baers, Merit, and Country Bank continued in 1991 and 1992, with counsel exchanging draft agreements and comments on those drafts. In one letter Merit’s counsel, referring to paragraph 19 of the proposed agreement, a paragraph central to the dispute in this case, suggested language to “make clear the $200,000 or $300,000 floor [in paragraph 19] would apply only if [Country] Bank acquires the [Lapides Property]. ” Exhibit 3, tab 11. The Agreement included Merit’s suggested changes. Exhibit 3, tab 12. On July 7, 1992, the Baers, Lapides, Country Bank, and Merit entered into their agreement (“the Agreement”). Id. The United States Bankruptcy Court approved the Agreement on July 30, 1992, Exhibit 3, tab 2, page 2.
On September 2, 1992, the Baers’ counsel sent counsel for Merit and Country Bank Cold Springs’ “updated proposal for the Phase I work” at the Lapides Property. Exhibit 3, tab 15. Cold Springs proposed to do the work outlined at a cost not to exceed $3,325, and sought a 50% retainer and a letter of authorization before proceeding. Id., page 4. In his letter, the Baers’ counsel sought the requested authorization and “a check for $1,662.50 payable to Cold Springs Environmental." Id. page 1. On October 22, 1992, following revisions to this updated proposal, exhibit 3, tabs 16 and 17, Country Bank sent the Baers’ counsel a check for $1,662.50, payable to Cold Springs. Exhibit 3, tab 18. Merit’s counsel received a copy of that letter. Id. Following receipt of Cold Springs’ Phase I Limited Site Assessment, exhibit 3, tabs 19 and 20, the Baers’ counsel sought payment from Country Bank for the balance of Cold Springs’ bill. Exhibit 3, tab 21. Within three weeks, Country Bank paid in full, by check payable to Cold Springs, again copying Merit’s counsel. Exhibit 3, tab 22. None of the parties ever arranged for a Phase II environmental site assessment of the Lapides Property, nor did the Baers ever provide Country Bank with a non-recourse second mortgage on the Lapides Property as they agreed to do.
On April 14, 1993, upon motion of the United States Bankruptcy Trustee, exhibit 3, tab 23, a judge dismissed the Baers’ chapter 11 petition. Exhibit 3, tab 25. On June 29, 1993, Country Bank’s counsel wrote to the Baers, with a copy to Merit and the Baers’ counsel, to inform the Baers that “to the extent that the Agreement remain[ed] operative,” they were in default for failing to make the $500 monthly payments that they had agreed to make. Exhibit 3, tab 26. Country Bank further stated that it had elected not to contribute to further remediation of the Lapides Property, and that it reserved its “right to rescind the Agreement by virtue of the dismissal of the underlying Bankruptcy Case.” Id. In reply, the Baers’ counsel expressed “concern” about Country Bank’s calling into question the continuing viability of the Agreement, exhibit 3, tab 27, but nonetheless the Baers paid their outstanding obligations on July 9, 1993. Exhibit 3, tab 28. However, given that the Baers’ counsel conditioned Country Bank’s acceptance of this payment on Country Bank’s concurrence that the Agreement remained viable, Country Bank returned the check, stating that, due to the bankruptcy case’s dismissal, “it would appear that the Agreement is not operative at this time.” Exhibit 3, tab 30.
On September 29, 1993, the Baers conveyed the Lapides Property to Taken to the Cleaners, Inc., a corporation they owned and controlled. On May 12, 1994, Country Bank wrote to the Baers and Taken to the Cleaners, Inc. stating its intention to foreclose on the mortgage which the Baers had given to Country Bank. Exhibit 3, tab 34. On June 13, 1994, Country Bank conducted a mortgage foreclosure auction sale of the Lapides Property, where the highest bidder, Ik Joo Moon, agreed to pay $25,000 for the property. On July 14, 1994, Country Bank conveyed the Lapides Property by foreclosure deed to Kang El Lee Realty Corp., Ik Joo Moon’s nominee. Exhibit 3, tab 36. Country Bank did not share any of the $25,000 proceeds of the foreclosure sale with Merit. Following the foreclosure sale, Country Bank still had a substantial deficiency on its loan to the Baers, and it obtained a deficiency judgment of $328,446.49 against them. Exhibit 3, tab 37. On December 12, 1995, Merit dismissed its superior court case against the Baers and Lapides, without prejudice. Exhibit 3, tab 38, page 2.
On March 22, 1996, Merit’s counsel sent a demand letter to Country Bank pursuant to G.L.c. 2 IE, (“2 IE”) §4A. Exhibit 3, tab 40. On March 27, 1996, Country Bank’s counsel responded. Exhibit 3, tab 41. In that *252 letter, Country Bank disputed, with explanation, Merit’s assertion that Country Bank could be liable to it under 2IE. Country Bank also stated that “[t]o the extent that it is Merit’s position that [Country] Bank either contributed to any release or acquired ownership or possession of [the Lapides Property], then this shall constitute a request under M.G.L. 2IE, §4 for additional documentation substantiating this allegation.” In reply, Merit stated in pertinent part that
[c]ontrary to your opinion that Country Bank for Savings cannot be deemed an owner or operator in this instance, I am advised that the Bank, in fact, was deeply involved in the business operated by the Baers so as to expose it to liability. In addition, the Bank made entry upon and took control of the premises, which it ultimately sold to Ik Joo Moon prior to the foreclosure sale. As a result, we suggest that under Massachusetts law your client can in fact be viewed as an owner or operator for the purposes of M.G.L.c. 2 IE. We also have reason to believe that your client took other steps which confirm this position, and we will pursue these in formal discovery if necessary.
Exhibit 3, tab 42.
I find that Merit, neither pre-suit nor at trial, produced any evidence that Country Bank was “deeply involved” (or involved at all) in the Baers’ business or that Country Bank ever did anything other than lend the Baers money, enter into the Agreement to tiy to salvage its financial position, and then foreclose on the Lapides Property when the Baers’ defaulted. Further, Merit provided no meaningful reply to Country Bank’s request for additional documentation as set forth in Country Bank’s March 27, 1996 letter. Neither party sought nor attended any meeting to try to resolve Merit’s asserted 2 IE claim against Country Bank prior to Merit’s filing suit.
Country Bank repeated its position that Merit had no basis for suing it under 2 IE in a September 5, 1996 letter to Merit’s counsel. Exhibit 3, tab 43. In that letter Country Bank, at variance with its previous suggestion that the Agreement became “inoperative” when the bankruptcy court dismissed the Baers’ petition, also argued that, pursuant to the Agreement, Merit had released its claims against Country Bank so that Merit could not sue it for contamination of Merit’s property. Id. Merit responded on November 14, 1996 that ”[i]f [Country Bank is] correct in maintaining, as [it] apparently doles], that the Agreement is not a nullity, but is still in force, [Country Bank] has breached the terms of this written Agreement” by not advancing $25,000 to pay for the two site assessments and by failing to pay Merit sums due under paragraphs 18 and 19 of the Agreement. Exhibit 3, tab 44.
Merit filed suit thereafter. Its claims included a 2IE violation against Country Bank that Merit dismissed on the eve of trial. Merit tried only its breach of contract claim against Countiy Bank. For its part, Country Bank presses its fifteenth defense that it is entitled to attorneys fees and costs under 2IE, §4A(f) for Merit’s violation of that statute. Both Merit and Country Bank seek their costs and reasonable attorneys fees under paragraph 24 of the Agreement.
II. RULINGS OF LAW A. Country Bank’s “Frustration of Purpose” Argument
Country Bank initially argues that its performance under the Agreement is excused under the “frustration of purpose” doctrine. See e.g., Chase Precast Corporation v. Paonessa, 409 Mass. 371, 373-78 (1991); Restatement (Second) of Contracts, section 265 (1981). “Under frustration, ‘performance remains possible but the expected value of performance to the party seeking to be excused has been destroyed by the fortuitous event.’ ” Chase, 409 Mass. at 374. The Restatement section cited above, “consistent with [the Supreme Judicial Court’s] previous treatment of impossibility of performance and frustration of purpose,” id. at 375, defines the doctrine as ”[w]here, after a contract is made, a party’s principal purpose is substantially frustrated without his fault by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to tender performance are discharged, unless the language or the circumstances indicate the contrary.” Here, Country Bank asserts, the April 14, 1993 dismissal of the Baers’ bankruptcy petition frustrated the purpose of the Agreement. Country Bank contends that it had no reason to deal with Merit had the Baers not filed for bankruptcy, sifter which Merit claimed an administrative priority on the Baers’ assets because Merit had and would expend money cleaning up property that, it alleged, the Baers contaminated. The Agreement, Country Bank claims, was in effect a reorgsmization plan for the Baers under the bankruptcy laws, noting that it required the approval of a bankruptcy court judge and specifically referenced certain acts to be accomplished under the bankruptcy code. When the bankruptcy court dismissed the Baers’ bankruptcy petition, the argument continues, the rationale for Country Bank’s participation in the Agreement, smd the benefits that it sought thereunder, vanished. Thus, dismissal of the Baers’ bankruptcy petition “frustrated the purpose” of the Agreement, and excused Country Bank from further performance. Accordingly, the argument concludes, because Country Bank was excused from further performance as of April 13, 1993, it could not have breached the Agreement thereafter, and judgment should enter in its favor. I do not agree.
Before deciding whether the dismissal of the Baers’ bankruptcy petition “frustrated the purpose” of the Agreement, it is necessary to try to determine the Agreement’s purpose or purposes. This is required under the Restatement section cited above: to determine if a “party’s principal purpose is substantially *253 frustrated” one must identify a party's “principal purpose^).” But this analysis need not reach the point of deciding what the, as opposed to a, principal purpose was; as comment (a) to section 265 of the Restatement explains, "the purpose that is frustrated must have been a principal purpose of that party in making the contract. It is not enough that he had in mind some specific object without which he would not have made the contract. The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would have made little sense” (emphasis added).
The starting point for determining the principal purpose(s) of the Agreement is the Agreement itself. Cf., City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999). The Agreement, after reciting the basic chronology of the Baers’ relationship with Country Bank, of the bankruptcy filing, and of Merit’s claim to an “entitlement to administrative priority for Merit’s entire claim against the Baers ... then estimated at approximately $200,000,” exhibit 3, tab 12, U1A through H, states that the parties “believe that the cost of litigating the complex factual and legal issues presented by the aforesaid claims would exceed the cost of settlement, and further believe that their respective interests, as well as the interests of the Unsecured Creditors, would be best served through a chapter 11 plan of reorganization (the “Plan”) that incorporates the terms of this Agreement.” Id. at HL. Thus, the Agreement continues, while “neither [Country] Bank nor Merit is obliged to contribute towards cleanup of contamination originating on the Lapides Property,[1] this Agreement recognizes that Merit has already made such a contribution,” id. at and that “[Country] Bank, as holder of the mortgage on the Lapides Property, will benefit from contributions made by Merit and by the Baers as well as by [Country] Bank itself towards cleanup of contaminants associated with the dry cleaning facility on that Property.” Id. at HO. These paragraphs set forth the principal purposes of the Agreement.
Country Bank argues, persuasively, that absent the Baers’ bankruptcy filing it would never have entered into the Agreement. After all, Country Bank had no reason to deal with Merit aside from Merit’s claim for administrative priority on the Baers’ assets, a claim that may have taken precedence over Country Bank’s secured creditor position only because the Baers had filed for bankruptcy. Thus, the Baers’ bankruptcy filing, and Merit’s claim for administrative priority, clearly caused Country Bank to deal with those parties on the issues covered by the Agreement. But there is, under the facts of this case, a difference between the cause(s) for entering into the Agreement and the purpose(s) of the Agreement, and it is this distinction that renders Country Bank’s position untenable.
The purposes of the Agreement are stated in the Agreement itself. They are to avoid “the cost of litigating the complex factual and legal issues presented by [the parties’ ■ claims in the bankruptcy proceeding, which] would exceed the cost of settlement," and to “further their respective interests, as well as the interests of the Unsecured Creditors . . . through a chapter 11 plan of reorganization . . .” Exhibit 3, tab 12, HL. By the time the bankruptcy court dismissed the Baers’ bankruptcy case, Country Bank had received substantial benefits under the first purpose stated in paragraph L and had advanced its interests as outlined in that paragraph’s second purpose as well. As to the former, the Baers’ filed for bankruptcy protection on April 3, 1991 id. at HA, and on July 23, 1991, Merit filed its proof of claim “asserting entitlement to administrative priority for Merit’s entire claim against the Baers . . . then estimated at approximately $200,000,” id. at 1IH (emphasis added), for the then-worthless property that had a value, absent any contamination, of $300,000. Id. at UK. Thus, by the time the bankruptcy court dismissed the Baers’ petition in April 1993, Country Bank had avoided nearly two years of what it had agreed would be expensive litigation, and so it had received a substantial part of the “performance” that it expressly sought in the Agreement. Accordingly, having received that benefit, Country Bank should not be excused from its performance.
Moreover, apart from litigation costs, Country Bank received the benefit of Merit’s foregoing a claim to, in the Agreement’s words, Merit’s potential “entitlement to administrative priority for Merit’s entire claim against the Baers . . . then estimated at approximately $200,000.” Id. at KH (emphasis added). Instead, Merit agreed to a formula that would yield Country Bank a better financial recovery than if Merit obtained the administrative priority that Merit claimed. Of course, Merit might not have succeeded in its claim for administrative priority, but it refrained from trying, and so Country Bank received the benefit of Merit’s performance in that regard. For its part, Merit traded its uncertain claim for administrative priority worth $200,000 for a lower possible recovery while reducing the risk that it would receive nothing, given Country Bank’s $260,773 secured mortgage balance. Id. at ¶0. Such cost-benefit allocations are typical and Country Bank received the benefit of Merit’s forbearance here. Thus, Country Bank received much, if not all, of the “performance” that it sought under the Agreement in this regard also.
In sum, while the Baers’ bankruptcy petition set in motion the events that led to the Agreement, Country Bank substantially received the benefits that it sought in it. The Agreement’s “principal purposes” were largely accomplished. I therefore do not accept Country Bank’s argument that the frustration of purpose doctrine excused it from performing under the Agreement after the April 1993 dismissal of the Baers’ bankruptcy petition. It follows that this doctrine can *254 not serve as a basis for Country Bank’s defense to Merit’s breach of contract claims.
B. Merit’s Breach of Contract Claims
Merit asserts that Country Bank breached the Agreement in two ways: it failed to advance $25,000 for two site assessments under paragraph 1 of the Agreement, and it failed to pay Merit upon the sale of the Lapides Property pursuant to paragraphs 18 and 19 of the Agreement. Complaint, count XXXVI, paragraph 202.1 reject both of these contentions.
1. Country Bank’s Alleged Failure to Advance $25,000
Paragraph 1 of the Agreement provides that “[Coun- . try Bank] shall advance, subject to the limitations set forth in paragraph 4, below, $25,000 to pay for the Phase I Limited Environmental Site Assessment and for the Phase II Comprehensive Site Assessment of the Lapides Property as required by the [Massachusetts Contingency Plan] and as described in scopes of work submitted by Cold Springs Environmental Consultants, Inc., in proposals dated October 16, 1991, which advance shall be secured by a non-recourse second mortgage on the Lapides Property, pursuant to section 364(c)(3) of the Bankruptcy Code.”
The Baers’ counsel twice wrote to Country Bank seeking payment for Cold Springs in connection with Cold Springs’ preparation of a Phase I Limited Site Assessment. Country Bank promptly paid both invoices in full. Neither the Baers’ counsel nor Merit ever submitted to Country Bank another invoice from Cold Springs or any other firm in connection with the Phase I Limited Site Assessment, and no Phase II Comprehensive Site Assessment occurred. Beyond paying the two Cold Springs invoices Country Bank never paid anything else relating to site assessments, so Merit in effect may be entitled to damages of $21,675 ($25,000 minus the $3,325 that Country Bank paid).
Country Bank defends on a number of grounds. First, it states that material breaches by both Merit and the Baers excused it from performing. See e.g., HRPT Advisors, Inc. v. MacDonald, Levine, Jenkins & Co., P.C., 43 Mass.App.Ct. 613, 626 n. 16 (1997) (“it is well-settled that a material breach of contract by one party excuses the other party from performance as a matter of law”). Specifically, it states that Merit failed to dismiss the pending superior court suit against the Baers and Lapides upon the bankruptcy court’s approval of the Agreement, and that when Merit finally did so, it did so without prejudice, allowing the case to be reinstated at a later date. I reject this argument because Merit’s actions (there is no doubt that Merit failed to dismiss the suit promptly) did not materially breach the Agreement, as is necessary for Country Bank to avoid performance for this reason.[2]
Country Bank argues that Merit materially breached the Agreement because the pendency of the lawsuit Merit should have dismissed cast a pall over efforts to sell the Lapides Property, or to obtain the maximum value for that property. First, dismissal of the lawsuit was not “an essential and inducing feature of the contract.” Nor did Country Bank ever bring Merit’s failure to dismiss the lawsuit to Merit’s attention, or demand Merit’s compliance. Tobe sure, Country Bank did not have to demand Merit’s compliance, but its failure to do so suggests that this was not, as events unfolded, material to the Agreement. Further, Country Bank introduced no evidence that the pending lawsuit dissuaded any buyer from purchasing the Lapides Property prior to its dismissal, or that the $25,000 foreclosure price paid after the dismissal related to the lawsuit’s existence. Finally, the Agreement did not require that the dismissal be with prejudice. Hence, I rule that under Lease-It Merit did not materially breach the Agreement by failing to dismiss the superior court lawsuit as it should have and therefore Merit’s breach does not excuse any non-performance by Country Bank.
Country Bank also argues that Lapides’ (or the Baers; they are interchangeable for these purposes and both names are used in the relevant paragraph) failure to make the payments required under paragraph 4 of the Agreement also excused it from perform-, ing. This argument also fails. Passing the question of whether the Baers’ failure to perform could excuse Country Bank from its obligations to Merit, a question that I need not decide but have doubts about (given the possible benefits that Merit gave up by the Agreement, it is far from clear' that the Baers’ failure to make $500 monthly payments would permit Country Bank to retain its priority, secured creditor status after Merit gave up its opportunity to seek administrative priority, despite Merit’s large contributions to the clean-up), the Baers did, upon notice from Country Bank that it had not made the necessary payments, tender a check for payment in full, albeit upon certain conditions. Paragraph 5 of the Agreement allowed the Baers to cure their default (why else would the Agreement address what happens if “such default continues for ten (10) days after [Country] Bank’s mailing of notice of such default?”, exhibit 3, tab 12, page 5), and the Baers did so. Exhibit 3, tab 28. Country Bank rejected the Baers’ payment and must accept the consequences of that decision. It is surely understandable that, given Country Bank’s counsel’s questioning the Agreement’s viability when notifying the Baers that they owed Country Bank back payments, the Baers sought adequate assurance that Country Bank would not take their money and then disclaim any further obligations under the Agreement. Hence, I rule that under paragraph 5 of the Agreement the Baers properly offered to cure their breach of paragraph 4 of the Agreement, and that their conduct, even if it could excuse Country Bank’s further performance, (which, under Lease-It, I rule it could not) did not do so here. Accordingly, this defense to the breach of contract claim fails.
*255 Country Bank also contends that it promptly paid all the payment demands sent to it concerning the environmental site assessments, and therefore it did not breach this aspect of the Agreement. I rule that this argument is correct, and is a defense to Merit’s breach of contract claim on this issue.
To begin with, Country Bank’s obligation under the Agreement for the environmental site assessments was not self-executing; by that I mean that its obligation to advance money did not arise from the mere passage of time (i.e., to pay money by a certain date or dates) nor by the occurrence of an identified event. Instead Country Bank had to advance funds for work identified in Cold Springs’ “scopes” of work. The first two advances sought from Country Bank demonstrate how this process could be expected to work; the Baers’ lawyer sought payment with documentation verifying that the work was done under Cold Springs’ “scopes” of work. While this did not have to be the only procedure used, it showed in practice how Country Bank could be provided with the necessary information to meet its obligation. After making those two payments, however, Country Bank received no more requests for payment, from anyone, for the advances it had agreed to make. Absent such information, could Country Bank know what, if anything, it owed, when, to whom, and for what work? No. The only request that approached satisfying the Agreement on this issue eame in Merit’s counsel’s November 14, 1996 letter, exhibit 3, tab 44, which stated in substance that Country Bank’s failure to pay $25,000 breached the Agreement. But pay to whom, and why? After all, Country Bank never agreed to pay Merit $25,000. Had Merit advanced to Cold Springs or any other firm the difference between what Country Bank had already paid and $25,000, for work contemplated by Cold Springs’ “scopes” of work, then Country Bank might be liable to Merit for Merit’s advances. In such circumstances, Merit’s demand, had it demonstrated that Merit made such payments, would suffice, and Country Bank’s argument here would fail. But Merit’s letter gave Country Bank no reason to pay Merit, or anyone else, anything. Thus, because Country Bank never learned from Merit or anyone else that it owed any money for any Phase I or Phase II site assessments beyond that which it had already paid, Country Bank is not liable to Merit for breaching this provision of the Agreement. For these reasons, judgment will enter for Country Bank on this aspect of Merit’s breach of contract claim.
Moreover, and independent of the ruling immediately above, even if Merit’s November 14, 1996 letter adequately notified Country Bank that it owed money relating to the site assessments, a contention I have rejected, Merit produced no proof at trial that it spent any money for either the Phase I or Phase II site assessments described by Cold Springs such that Country Bank must reimburse it. Merit never proved at trial that any work beyond that already paid for by Country Bank for the Phase I Limited Environmental Site Assessment ever occurred. Nor did Merit introduce any evidence that a Phase II Comprehensive Site Assessment occurred. Merit’s argument that the $25,000 advance did not depend on such proof is unpersuasive. In the first place, Country Bank did not agree to pay Merit $25,000 for general clean-up costs, although that is how one would have to read paragraph 1 for Merit’s argument to prevail. Instead, Country Bank agreed to advance a limited amount of money for two stated purposes: the Phase I Limited Site Assessment and the Phase II Comprehensive Site Assessment, both as described in Cold Springs’ October 16, 1991 “scopes” of work. Paragraph 1 of the Agreement explicitly limited Country Bank’s obligation to those site assessments. As stated above, if Merit had incurred the site assessment costs described in paragraph 1 it might be entitled to reimbursement from Country Bank up to the stated amount, if the work tracked that described by Cold Springs in its October 16, 1991 “scopes” of work. But there is no evidence that this happened. Accordingly, Merit’s breach of contract claim also fails in this respect.[3]
2. Country Bank’s Failure to Pay Merit Following the Lapides Property Foreclosure
Merit’s other breach of contract claim is that Country Bank breached its obligations to pay Merit a substantial amount of money (more than $200,000, by Merit’s calculations) following the foreclosure sale of the Lapides Property to Ik Joo Moon for $25,000.[4]
At the outset, there is substantial appeal to Country Bank’s argument that it is absurd to interpret the Agreement to mean that Country Bank must pay Merit more than $200,000 for a property that garnered it $25,000 (before expenses) at a foreclosure sale. By the Agreement the parties intended to provide both Country Bank and Merit with some return, if there was to be a return, on their remediation expenses while preventing the other party from unfairly reaping a windfall from their joint contributions. Adopting the interpretation Merit urges would have guaranteed it just such a windfall if ever Country Bank foreclosed on the Lapides Property, an obvious possibility when the parties made their Agreement. Such a result is contrary to the principle of contract interpretation that, so far as reasonably practical, a contract should be construed to make it a rational business instrument and to effectuate what appears to have been the parties’ intentions. City of Haverhill, 47 Mass.App.Ct. at 720. It is difficult to accept that Country Bank would have entered into an Agreement that, upon a foreclosure, would have cost it money that it had lent and also required it to pay an additional $200,000-plus to Merit. But I need not explore this argument further because Merit’s contention fails for a simpler reason.
*256 Paragraph 19 of the Agreement details the calculation of Merit’s share of any recovery from the sale of the Lapides Property. It provides that Merit’s remediation costs, which form the denominator of the fraction to be divided into the Purchase Price, were to be documented, quantified, and submitted to Country Bank for its approval or review by a pre-approved firm set forth in Appendix A to the Agreement. If Country Bank or its consultant disagreed with Merit’s claimed remediation costs, Country Bank and Merit were to select from Appendix A an independent consultant whose decision “shall be final.” But Merit never complied with these provisions. It never sent documented and quantified remediation costs to Country Bank so that this process could be followed. Instead, it filed suit. The Agreement here is explicit, and Merit failed to meet its obligations. The Agreement entitled Country Bank to review of all of Merit’s claimed remediation costs, with the assistance of a consultant pre-approved by Merit, and provided for a binding, out-of-court resolution of any disputes by another independent consultant, also pre-approved by Merit. Merit’s failure to comply with these provisions materially breached the Agreement, and excuses Country Bank from making any payment under paragraphs 18 and 19 of the Agreement. As implied in my rejection of Country Bank’s “frustration of purpose” argument, I rule that avoidance of litigation costs was an “essential and inducing feature” of the Agreement. Lease-It, 43 Mass.App.Ct. at 396. By ignoring this dispute resolution procedure, Merit deprived Country Bank of the material benefits that Country Bank sought by the Agreement, and ensured that litigation costs would follow. Merit’s material breach excused Country Bank from performing under paragraphs 18 and 19 of the Agreement, and Country Bank cannot be liable for any breach of those paragraphs. Hence, Merit’s allegation that Country Bank breached paragraphs 18 and 19 of the Agreement cannot prevail.[5]
For the foregoing reasons, I rule that Merit has failed to carry its burden of proving, by a preponderance of the evidence, that Country Bank breached the Agreement. Accordingly, judgment will enter for Country Bank on count XXXVI, complaint, paragraph 202, Merit’s breach of contract claim.[6] In addition, pursuant to paragraph 24 of the Agreement, which provides that “[i]n the event of litigation relating to this Agreement, the prevailing Party(ies) shall be entitled to all costs, fees and expenses, including reasonable attorneys fees,” I rule that Country Bank is entitled to recover its “costs, fees and expenses, including reasonable attorneys fees.” Country Bank shall have until July 28, 2000 to file, in proper form, an application for such costs, fees, and expenses, including its reasonable attorneys fees. Merit shall have until August 18, 2000 to file its response. I will hold a hearing on Country Bank’s application if necessary; otherwise, the case will go to judgment in due course after I receive Merit’s response.
C. Country Bank’s Claim for Costs and Fees Under 2IE, §4A(f)
In its fifteenth defense, Country Bank asserted that “[t]his defendant should be awarded litigation costs and reasonable attorneys fees under G.L.c. 21E, §4A(f), on the basis that the Plaintiff did not participate in negotiations or dispute resolution in good faith; the Plaintiff had no reasonable basis for asserting that Defendant was liable; and the Plaintiffs position with respect to the amount of this Defendant’s liability pursuant to ch. 2 IE was unreasonable.” I rule that the first two aspects of this defense, independent of each other, are correct i.e. that Merit did not participate in negotiations or dispute resolution in good faith and that Merit had no reasonable basis for asserting that Country Bank was liable to it under 2IE, but I reject the third, i.e., that Merit’s position with respect to the amount of Country Bank's liability was unreasonable. Accordingly, pursuant to 2IE, §4A(f) I award Country Bank its “litigation costs and reasonable attorneys fees” for defending against Merit’s 2IE claim. To the extent that this award duplicates the award that I have already allowed under paragraph 24 of the Agreement, Country Bank will be limited to one recovery.
I make this ruling because Merit failed to comply-with those provisions of 2 IE that are intended to ensure that a potential 2IE defendant be made aware of the facts and legal theories underlying any claims made against it under 21E. For example, 21E, §4A(b) provides in pertinent part that “[w]ithin sixty days after the notifier [i.e., Merit] has received the response [to a notice of potential responsibility for clean-up costs] the notifier and the responder [i.e. Country Bank] shall confer in good faith in an effort to resolve all disputes that may exist between them with respect to participation in or funding of the response action, or other actual or potential liability in question. Upon request by the responder, the notifier shall provide additional information or documentation reasonably requested by the responder concerning the basis of the responder’s alleged liability or the response action or both” (emphasis added). Here, Country Bank, through its counsel’s March 27, 1996 letter, exhibit 3, tab 41, specifically requested the additional information that 21E requires Merit to divulge, although the letter mis-cited the governing statutory provision. Merit’s reply, dated August 27, 1996, exhibit 3, tab 42, failed to meet its obligations under the statute. In alternately vague and conclusory terms, Merit simply asserted that Countiy Bank was “deeply involved” in running the dry cleaning business on the Lapides Property, and then re-stated its readiness to sue absent a settlement. Country Bank knew little more after receiving this letter than it did before; indeed, Merit added a further layer of unexplained, and ultimately unsubstantiated, allegations. If Merit had a factual, reasonable basis to assert that Country Bank might qualify as an “owner” or “operator” under 2IE, §2, or that Countiy Bank could not avail itself of the secured lender exemption, *257 21E §2(c), it had to state that basis in response to Country Bank’s reasonable request that it do so, but it did not.
The importance of this pre-suit exchange of information (under 21E, §4A(c), suit maybe brought “[olnly after notice has been given and the procedures described in this section have been carried out” (emphasis added)) is manifest; the rarity of mandatory pre-suit exchange of information makes that point clear enough. But the nature of 2IE litigation reinforces the importance of these requirements. 2IE litigation can be complex, almost certainly involving engineering, environmental, and legal specialists to be done correctly, and the stakes for the parties may be significant. The attention of a party’s past and present employees, including perhaps those at the highest level, maybe required. The trial of these cases maybe lengthy. Finally, resources can be directed to a cleanup if settlement, rather than litigation, results. In short, all the considerations that counsel parties to make good faith efforts to resolve disputes pre-suit exist in 2IE cases, and 2IE makes such efforts mandatory.
But this comprehensive legislative scheme is frustrated where, as here, a “responder” makes a reasonable request for information from a “notifier” and receives an inadequate response. Such a reply is not ”participat[ing] in negotiations or dispute resolution in good faith,” and instead ensures that negotiations or dispute resolution will take place, if at all, following the filing of suit, because only through discovery will the “responder” be able to obtain the information that it sought but did not receive. Country Bank’s failure to seek pre-suit resolution can hardly be held against it where Merit denied it the information necessary to evaluate Merit’s claim. For this provision of 2IE to be meaningful, a party must be held to the obligations imposed upon it by the Legislature. Merit did not meet those obligations. Accordingly, Merit will be ordered to pay Country Bank’s litigation costs and reasonable attorneys fees defending against Merit’s 2IE claim.
As a separate and independent basis for holding Merit liable for Country Bank’s litigation costs and reasonable attorneys fees in defending against Merit’s 2IE claim, I rule that Merit had no reasonable basis for alleging Country Bank to be liable under 2IE. As demonstrated by the October 27, 1997 Memorandum of Decision and Order on Defendant Country Bank for Saving’s Motion for Summary Judgment (the “Memorandum”) Country Bank could be liable to Merit under 2IE only if it “owned” or “operated” the Lapides Property. Memorandum at 5-6. Country Bank, by the uncontroverted evidence, did not “operate” a business on the Lapides Property. Id. at 7. Hence, Country Bank could be liable to Merit only if Country Bank “owned" the Lapides Property at a relevant time, as 21E defines “owner.” The Memorandum denied summary judgment to Country Bank on this latter point, stating that “whether a mortgagee can be an ‘owner’ under [2 IE] concerns a question of fact that cannot appropriately be resolved in a motion for summary judgment,” id. at 6-7, and that, for the same reason, Country Bank could not, as a matter of law, escape liability under 21E’s “secured lender exemption.” Id. at 7-10. Merit urges that this ruling precludes Country Bank from receiving the award that it seeks. I disagree.
To begin with, the standard I apply now is that of the fact-finder, not that of a judge deciding a summary judgment motion. I do not now uncritically accept all of Merit’s factual assertions as true, nor need I draw all reasonable inferences in its favor, while the motion judge had such an obligation. The facts as I have found them persuade me that Country Bank never “owned” the Lapides Property as that term is defined in 2IE, and I adopt entirely the Memorandum’s ruling that Country Bank never “operated” any business on the Lapides Property. More importantly, Merit never had any reasonable basis for alleging that Country Bank did either of these things. Merit’s “law of the case” argument, cf. King v. Driscoll, 424 Mass. 1,7-8 (1996), does not yield a different result because I rule now as a fact-finder, not as a judge deciding a summary judgment motion. That Merit’s factual assertions when taken in the light most favorable to it led to the denial of Country Bank’s summary judgment motion does not preclude a ruling following a trial that Merit had no reasonable basis for pursuing a 2 IE claim against Country Bank. In making my ruling I do not consider Merit’s dismissing its 2IE claim pre-trial or its deciding not to call its general counsel to testify. Neither bears on my ruling in any way.[7]
For these reasons, I rule that Country Bank is entitled under 2IE, §4A(f) to its litigation costs and reasonable attorneys fees in defending against Merit’s 2 IE claim. Country Bank shall have until July 28, 2000 to file, in proper form, an application for such costs and fees. Merit shall have until August 18, 2000 to file its response. I will hold a hearing on Country Bank’s application if necessary; otherwise, the case will go to judgment in due course after I receive Merit’s response.
ORDER
Judgment shall enter for Country Bank on Merit’s breach of contract claim. Country Bank shall recover its costs and expenses, including its reasonable attorneys fees, consistent -with the rulings and timetable set forth above.

Notwithstanding this. Merit’s 21E count against Country Bank asserts that Country Bank indeed had such an obligation.

In my rulings on this and the other several arguments that concern the “materiality” of alleged breaches, I rule as a fact finder. See e.g., Lease-It, Inc. v. Massachusetts Port Authority, 33 Mass.App.Ct. 391, 396 (1992) ("[wlhether a breach is material or immaterial normally is a question for the jury to decide”). In this jury-waived case I perform the jury’s function in this regard. The legal standard that I apply is that stated in Lease-It: “[a] material breach of an agreement *258 occurs when there is a breach of an essential and inducing feature of the contract." Id. As an example, in Lease-It the plaintiffs failure to pay concession and rental fees “was a substantial breach going to the root of the contract.” Id.

I reject Country Bank’s defense that the Baers’ failure to provide it with a non-recourse second mortgage to secure its advances excused Country Bank from' performing under paragraph 1. For the reasons stated above, I doubt, but do not decide, that the Baers’ failure in this respect could, as a matter of law, excuse Country Bank’s performance; more to the point, as with Merit’s failure promptly to dismiss the superior court litigation described in the Agreement in paragraphs E and 20,1 rule that this breach by the Baers was not material. See Lease-It, 43 Mass.App.Ct. at 396. This was not an “essential or inducing feature of the contract," id. and, as with Merit’s failure to dismiss the superior court lawsuit, Country Bank took no steps to secure or demand the promised non-recourse second mortgage, suggesting that it lacked importance as events unfolded, nor did any evidence indicate that the Baers’ failure to meet their obligation injure Country Bank in any way.

Merit argues that Country Bank “credit bid” the Lapides Property, as described in paragraph 19 of the Agreement, and hence that the Purchase Price, as described in that paragraph, must be at least $200,000.1 reject this argument. The evidence is clear that Country Bank sold the Lapides Property at a foreclosure auction. No evidence suggests that Country Bank even made any credit bids, much less that it purchased the property by credit bidding. For purposes of paragraph 19, the Purchase Price of the Lapides Property is $25,000.

I reject Merit’s assertion that it would have been “futile” to submit its remediation costs to Country Bank for analysis, and, if necessary, resolution under paragraph 19. See D. Federico Co., Inc. v. New Bedford Redevelopment Authority, 9 Mass.App.Ct. 141, 143(1980) (”[a]lthough performance of a particular act by one party is contractually specified to be precedent to the arising of an obligation in another, the prior act need not be performed where it would be a hollow gesture sure to be disregarded by the other party” (quoted case omitted)). Merit bases this argument, at least largely, and to my understanding entirely, upon Country Bank’s counsel’s June 29, 1993 letter to the Baers’ counsel. Exhibit 3, tab 26. However, by September 25, 1996, Country Bank’s letter to Merit’s counsel at least implicitly stated Country Bank's belief that the Agreement was still valid by asserting that any breach of contract suit by Merit would fail because of the release in paragraph 21 of the Agreement. Merit’s counsel’s November 14, 1996 reply makes clear that he understood that Country Bank believed that the Agreement remained viable. See exhibit 3, tab 43 (”[I]f you are correct in maintaining, as you apparently do, that the Agreement is not nullity, but is still in force . . .”). Given this correspondence, Merit cannot convincingly argue that it would have been, or even that Merit believed that it would have been, a “hollow gesture” to comply with the Agreement’s provisions. Instead, Merit either should have demanded that Country Bank state its position on Merit’s obligations under paragraph 19 or it should have sent the required information and let Country Bank decide what to do with it. The facts here do not permit Merit to invoke futility to avoid the material provisions of paragraph 19.

Because Merit has not proven that Country Bank breached the Agreement, I need not address the issue of damages, the subject of nearly all of the live testimony at trial.

I reject any argument that Country Bank’s “entry upon” or “control” of the Lapides Property is or was a reasonable basis for Merit to assert Country Bank’s liability to it under 21E. Exhibit 3, tab 42. The only evidence is that Country Bank took the steps necessary to foreclose on the Lapides Property; it did nothing beyond that. The argument becomes primarily a legal one. The evidence demonstrated that Country Bank met all of the requirements of 21E, §2(c) as in effect in 1996. Accordingly, Country Bank met the threshold test of a “secured lender," and a secured lender is “not [to] be deemed an owner or operator” under 21E. Id. Second, even if Country Bank’s foreclosure actions amounted to its “acquiring ownership or possession” of the Lapides Property, which I doubt but need not decide, see 2 IE, §2(c)(3), Country Bank satisfied all of the conditions of that portion of 2 IE so as to maintain its secured lender exemption. Finally, Merit introduced no evidence, and made no argument, that any release(s) occurred after Country Bank allegedly acquired any “ownership or possession” of the Lapides Property, which, had that occurred, might render Country Bank liable as to those releases. See 2 IE, §2(c)(3)(E)(iv). Most important for the present purposes. Merit never had any reasonable basis in fact or law for asserting that Country Bank’s foreclosure actions deprived Country Bank of 21E’s secured lender exemption. Adopting Merit’s argument would mean that merely foreclosing on contaminated property would deprive a secured lender of the secured lender exemption so carefully detailed in 2XE; the secured lender exemption would essentially be meaningless. This is a result the Legislature could not have intended, and that Merit could not reasonably assert.