Lauriat, J.
Marvin M. Glick (“Glick”), as trustee of the Needham Street Investment Trust (“NSIT”), brought this action against Principal Mutual Life Insurance Company (“Principal Life”) and New Boston Fund IV, Inc., as the general partner of New Boston Paragon Limited Partnership (collectively, “New Boston LP”), seeking to enforce an easement agreement governing the rights of the parties to use each other’s property for access and parking purposes. The defendants contend, on several grounds, that the easement has been extinguished. Alternatively, the defendants assert that NSIT cannot enforce the easement agreement because it has “unclean hands.” The action is now before the court on the parties’ cross motions for summary judgment. For the following reasons, the defendants’ motion for summary judgment is allowed, and the plaintiffs summary judgment motion is denied.
BACKGROUND
In the early 1980s, Peter and Jeanne White (“the Whites”) owned a single undivided lot on Needham Street in Newton, Massachusetts. The Whites sought to sell part of their holdings and split the parcel into Lots 8 and 8G. For purposes of commercial development, Lot 8 had sufficient parking spaces to meet the municipal parking requirements of the City of Newton (“Newton”). However, Lot 8G did not have enough parking spaces to satisfy Newton’s minimum parking standards. The Whites sought to sell Lot 8, now known and numbered as 233 Needham Street, to the 233 Realty Trust, whose sole trustee was Glick. The Whites planned to keep Lot 8G, which comprised 215 through 227 Needham Street.
*262 In 1981, prior to any sale, the Whites petitioned Newton for a special permit that would exempt Lot 8G from the city’s applicable parking requirements. Although Newton’s Department of Planning Development recommended that the Whites’ petition be denied, the city’s Board of Alderman issued a special permit to the Whites. The special permit approved a 54-space exemption for Lot 8G, but contained a number of conditions. Among the conditions was a provision that the special permit would not go into effect until the Whites had recorded an instrument between themselves and whichever of their neighbors had the power to “provide for the right to cross and recross between lots 8 and 8G; [and] to permit parking on both lots by tenants, guests and customers of each lot...”
The Whites sold Lot 8 to 233 Realty Trust sometime prior to May 1983. On May 11, 1983, W1 .ite and Glick (as trustee of 233 Realty Trust) executed the agreement (“Agreement”) that Newton had required. The Agreement’s terms provided that the Whites and 233 Realty Trust granted to each other and to their “tenants and/or lessees, their guests, trustees, employees and/or licensees” the “perpetual right and easement" to enter each other’s parking lot from either Needham Street or Tower Road, either to park vehicles in each other’s lot or cross over each other’s lot to find parking spaces.
In May 1985, Paragon Towers Trust (“Paragon”), with Glick as sole trustee, built a three-story parking garage on Lot 8. The following month, 233 Realty Trust sold Lot 8 to Paragon. This purchase was financed by a loan from and a mortgage to Principal Life.
In June 1988, NSIT, with the ubiquitous Glick once again its sole trustee, purchased Lot 8G from 227 Needham Street Realty Trust, the trust that the Whites established. The following year, NSIT applied to Newton for a special permit/site plan approval for additional construction on Lot 8G. Among the items of new construction was a three-story parking garage that would accommodate 138 vehicles. Among NSIT’s arguments in support of its application was that the additional spaces would bring parking on Lot 8G into compliance with the city’s requirements, without recourse to special formulas, easements or other arrangements. Newton approved NSIT’s application and the parking garage was built.
In November 1988, Paragon entered into a ten-year lease with BayBank Middlesex (“BayBank”) for space in the office complex then located on Lot 8. BayBank had maintained offices in that building since 1970, and had always had reserved parking spaces in the parking lot associated with that building. However, the 1988 lease for the first time specifically made reserved parking spaces a part of the leasehold conveyed to BayBank. Paragon also signed leases with reserved parking spaces with George Beram & Company, Inc. in 1992, Kenneth Halpern & Associates in 1993, and Arlene and Roberta, The Two of Us, Ltd. in 1994. A total of eleven parking spaces were reserved through these leases.
On October 7, 1993, in the midst of the various lease agreements conveying reserved parking spaces, Principal Life foreclosed on its mortgage with Paragon and acquired title to Lot 8. Principal Life owned the property until it negotiated a sale to New Boston in December 1998. On December 9, 1998, just prior to that sale, NSIT filed this action.
NSIT alleges that the provisions in leases permitting the reserved parking spaces violate the terms of the perpetual easement between the two adjoining properties because they potentially prevent some of NSIT’s tenants, customers, their guests, employees or other invitees from using those particular parking spaces. NSIT sought an injunction to require New Boston LP to discontinue the practice of leasing reserved parking spaces, and to require New Boston LP to remove any signs that restricted parking, and for damages resulting from New Boston LP’s alleged violations of the easement.
New Boston LP has responded that while there once was an easement, it has, for a variety of reasons, now been extinguished. It contends that the easement was extinguished by merger during the time Glick was sole trustee of both NSIT and Paragon. Alternatively, New Boston LP asserts that the easement ended by reason of estoppel when Glick, as Paragon’s trustee, leased the reserved parking spaces, and through the construction of the parking garage that, brought Lot 8G into compliance with Newton’s parking requirements. The construction of the second parking garage also underlies New Boston LP’s contention that the easement ended through frustration of purpose since the easement was no longer necessary. Finally, New Boston LP asserts that Glick’s equitable claims are barred by the doctrine of “unclean hands,” since he himself executed leases with reserved parking spaces included in their terms.
DISCUSSION
Summary judgment will be granted when there are no genuine issues of material fact and where the record, including the pleadings and affidavits, entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and showing that the summary judgment record entitles it to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party satisfies this burden by submitting affirmative evidence refuting an essential element of the opposing party’s case, or by showing that the opposing party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991). The court, for the purposes of summary judgment, will consider the facts and all reasonable inferences from *263 those facts in the light most favorable to the non-moving party. Ford Motor Co., Inc. v. Barrett, 403 Mass. 240, 242 (1988).
I.
The parties do not dispute the fact that reciprocal easements existed between Lot 8 and Lot 8G. In addition, New Boston LP, with a single exception, does not dispute that the easements restrict its ability to lease reserved parking spaces in its parking area.[1] Therefore, New Boston LP must show that the easement has been extinguished in order to prevent NSIT’s enforcement of its terms. The court will address each of the several theories New Boston LP advances in support of its position.
It is well established that “an express easement can be extinguished only by grant, release, abandonment, estoppel or prescription." Canton Highlands, Inc. v. Searle, 9 Mass.App.Ct. 48, 52-53 (1980), and cases cited. An easement can also be extinguished through the doctrine of merger. Cheever v. Graves, 32 Mass.App.Ct. 601 (1992).
In order to extinguish an easement by merger, a unity of title must have come into existence in the same person . . . [An owner] cannot have an easement in its own estate in fee. For the unity of title to extinguish an easement, the ownership of the two estates must be coextensive. When a person owns one estate in severalty and only a fractional part of the other, there is no extinguishment of an easement.
Id. at 606 (internal citations omitted).
New Boston LP contends that the requisite common ownership of Lots 8 and 8G existed from June 1988, when Glick, already the owner of Lot 8, purchased Lot 8G from the Whites’ realty trust, through October 7, 1993, when Principal Life foreclosed on the mortgage and took title to Lot 8. This contention, however, overlooks the fact that both lots were owned at all times by separate realty trusts. Glick maintains that his involvement in both realty trusts was limited to that of a trustee of a nominee trust. “A nominee trust is a trust in which the trustee holds legal title to the trust property for the trust’s beneficiaries, but the beneficiaries exercise the controlling powers, and the actions that the trustees may take on their own are very limited.” Vittands v. Sudduth, 49 Mass.App.Ct. 401, 408 n. 11 (2000). Thus, in the context of a nominee trust, common ownership must arise from an identity of beneficiaries, not trustees. Glick provided the court with the names of the beneficiaries of his two trusts during the time of the alleged merger. The named beneficiaries of each trust are substantially different from each other. Although Glick was a beneficiary of both, he had a fractional interest in each, not the common ownership necessary to permit the doctrine of merger to extinguish the easement. Therefore, the easement was not extinguished through merger.
II.
New Boston LP next asserts that the easement was extinguished by estoppel. The party asserting an estoppel theory has the burden of proving three distinct elements: (1) that a representation was made intending to induce a course of action by the entity to whom the representation was made; (2) an act or omission by that entity that resulted from the representation; and, (3) detriment to that entily resulting from that act or omission. Clickner v. City of Lowell, 422 Mass. 539, 544 (1996).
New Boston LP first contends that the easement ended by estoppel when Glick leased reserved spaces to the tenants of Lot 8. Glick did so in his capacity as trustee of Paragon. Thus, the “representation” that New Boston LP relies on came from its predecessor in interest in Lot 8, not from the holder of the reciprocal easement. New Boston LP’s theory of extinguishment by estoppel must fail since it is unreasonable to believe that NSIT, which had no place within the communication chain, could be bound by this representation. In addition, New Boston LP has failed to present any evidence that Paragon’s questionable leases were granted with an intention to induce similar leases from later owners. Therefore, New Boston LP has not met the first element of its estoppel theory.
New Boston LP next points to NSIT’s construction of a parking garage on lot 8G as conduct amounting to a representation sufficient to support extinguishment by estoppel. The court cannot conclude that the mere construction of the parking garage was a representation intended to induce any conduct or action by New Boston LP. Further, New Boston LP’s reliance on existence of the new garage was not reasonable when it knew, or easily have discovered, that NSIT did not grant leases to its tenants that included reserved parking spaces even after the garage was built.
III.
Related to New Boston LP’s estoppel theory is its contention that the easement was extinguished through frustration of purpose. New Boston LP bases this theory, in part, on NSIT’s representations to Newton that the new garage would bring parking on Lot 8G within the City’s parking requirements. In addition, New Boston LP points to the fact that the new garage actually accomplished this end, eliminating the need that gave rise to the easement in the first place. NSIT counters that the parties are bound to a literal reading of the easement agreement. The Agreement’s language refers to the parking at ground level since that was all that existed at the time the Agreement was made, and it still retains unique value. Additionally, the court cannot properly consider the parking deficiencies since they are not referenced in the Agreement.
The extent of rights derived from an easement depends on the facts surrounding its creation. Bergh *264 v. Hines, 44 Mass.App.Ct. 590, 592 (1998). In an attempt to give effect to the parties’ intentions, the express grant “must be construed with reference to all its terms and the then existing conditions so far as they are illuminating.” Id. In the present situation, the Agreement’s express language grants each owner reciprocal rights to access through and to park in the property of the other. However, Lot 8G's initially insufficient parking is very much an illuminating factor as it pinpoints the critical circumstance that gave birth to all that followed. There is no question that neither party wanted this easement but for Newton’s parking requirements. In those circumstances, the reasonable expectation of the parties would be that they would accommodate each other to the extent necessary to serve their greater interests.
Clearly, the parties’ desire to accommodate each other has disappeared. However, that fact alone would not excuse enforcement of the Agreement. Coupled with the parties’ differing intent was NSIT’s creation of a parking garage that would bring that Lot, by itself, into compliance with Newton’s parking regulations, an occurrence that was not anticipated at the time the Agreement was made. NSIT argues that despite the parking garage, the Agreement should be enforced since its performance is still possible.
Under the doctrine of frustration of purpose, a party’s principal purpose for entering into a contract is substantially frustrated without his fault by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made. Merit Oil of Massachusetts, Inc. v. Baer, Civil Action No. 97-188 (Mass.Super. July 5, 2000) (Curley, J.) (12 Mass. L. Rptr. 249). When such an occurrence changes the parties’ circumstances, the remaining duties to tender performance are discharged, unless the language or the circumstances indicate otherwise. Id. Therefore, the doctrine of frustration of purpose foresees the possibility that rote performance may still be possible, but considers “whether an unanticipated circumstance . . . has made performance vitally different from what was reasonably to be expected.” Chase Precast Corp. v. John J. Paonessa Co., Inc., 409 Mass. 371, 374 (1991). Should that vital difference destroy the expected value of the performance, the parties may be excused from further performance. Id. In the circumstances of this case, the court concludes that the parties’ reasonable expectations have been met and further performance of the Agreement takes on a sufficiently different aspect that the parties should be excused from such further performance.
Finally, NSIT has interposed its “at grade” argument, contending that it still receives value from the accessibility of premium parking spaces, since a space on the ground level is more desirable than a space on the upper levels of the parking garages. However, this contention is of dubious value, since it requires that one of NSIT’s tenants would see some advantage in having an employee or business invitee trek from an adjoining lot in inclement weather as opposed to a closer, covered spot adjacent to its building. Even accepting the “advantage" of ground level parking, the undisputed evidence is that this was an aspect of the Agreement beyond the reasonable expectations of the parties at the time the Agreement was made. The owners of Lot 8G sought the benefit of sufficient parking to allow them to separate from Lot 8 in a commercially viable manner. They accomplished that purpose, and their successors in interest now seek to additionally burden Lot 8, which always had sufficient parking, for purposes beyond the parties’ original bargain. Once again, this aspect of performance is so vitally different that further performance must be excused.
ORDER
For the above reasons, the Defendants’ Motion For Summary Judgment is ALLOWED, and the Plaintiffs Cross-Motion For Summary Judgment is DENIED.

 The single exception deals with NSIT’s contention that parking in Lot 8 for people using Lot 8G must be maintained “at grade," i.e. ground level. Therefore, the additional parking available through use of the upper parking levels, in NSIT’s view, has no effect on the easement. New Boston LP believes otherwise. This controversy will be addressed in the court’s discussion of New Boston LP’s claim that the easement has been extinguished through frustration of its purpose.