Fecteau, J.
This is a claim by the plaintiffs, owners and lessors of a 17-unit residential apartment building, against the defendant lessee, that the defendant breached the terms of the lease by failing to maintain the premises and failing to maintain the plaintiffs as insureds on the insurance policy, all as required by the lease. The defendant contends that he complied in all material respects to the lease and that the plaintiff is improperly attempting to take advantage of technical violations in order to deprive the defendant of his rights under the lease to exercise an option to purchase the property and after he has significantly improved the condition of the property and its value. Furthermore, the defendant claims that the plaintiff has improperly rejected the exercise of the option and seeks, in turn, an order that requires a conveyance to him.
Trial of this matter was held before me, sitting without jury, on November 12-13, 2002. The parties were granted until December 6, 2002, by which to file requests for findings of fact and rulings of law
FINDINGS OF FACT
1. The plaintiffs, George and Audrey Bell, have resided at all relevant times in Westborough, Massachusetts. They purchased the property in question, located at 3-5 Rugby Street, in Worcester, in 1978. It is a 17-unit residential apartment building and the plaintiffs managed it themselves until 1995. George Bell (“Bell”) is an experienced owner and manager of residential investment property.
2. The defendant David Nigro (“Nigro”) resides in Whitinsville and, in 1995, also had experience in the ownership and management of rental residential property. For several years, Bell and Nigro were employed for the same employer and knew each other. Prior to 1995 they had conducted business dealings with each other. In 1995, the defendant learned from Bell that he was interested in selling some or all of his investment property.
3. After examining a list of property that were owned by the plaintiffs, Nigro expressed an interest in purchasing the premises in question. Bell did not believe that the defendant could afford the property and so informed him. After making several visits to the property, but without being able to inspect all the apartments, Nigro asked for and received income and expense information from Bell. Although his impression of the property was that it was “tired” and needed work, he believed that such work was mostly cosmetic in nature. In making this assessment, he relied only upon his own experience and inspections of the property. Even though he had learned from the plaintiff and others that the property had problems of high tenant turnover and drug activity, Nigro was, nonetheless, still interested in acquiring an interest in it. He thereafter proposed to Bell that he be allowed to lease the entire premises for five years with an option to extend the lease and an option to purchase the property. After discussion of terms with Bell, Nigro had his attorney, Henry Lane, draft a proposed lease. It was executed by the parties, after some further negotiation and minor revision, on October 31, 1995.
*699 4. Under this lease, the defendant/lessee was entitled to receive all of the rental income generated by the property and obligated to pay a rental payment to the plaintiffs that equaled their monthly mortgage payment, as well as being obliged to pay all other costs and expenses of the property. The defendant was not obliged to pay the plaintiffs any money other than to make the monthly payments on their mortgage.
5. Among other obligations of the defendant under the lease was to maintain insurance on the properly and to name the plaintiffs as insureds on said policies; specifically, the defendant agreed “to keep the buildings and improvements on the premises insured in a responsible insurance company or companies for not less than $500,000.00, payable, in case of loss, to lessor as lessor’s interest may appear.” (Ex. 1, Part A, clause 7.) At the outset of the relationship, the defendant complied, through his insurance agent, the Robert Parker Insurance Agency of Northbridge. In January 1996, however, unbeknownst to the parties, and due to a need to transfer coverage from one insurance carrier to another, the plaintiffs were omitted from the necessary policies. This was not corrected until May 1997.
6. Another requirement imposed by the lease upon the defendant was to keep the property maintained in the condition it was at the time of the letting and, in particular: “to keep the premises in as good repair as the same shall be at the commencement of the term, wear and tear arising from the reasonable use of same and damages by the elements excepted.” (Ex. 1, Part A, clause 6.) At no relevant time had Nigro retained the services of a professional building inspector nor had he exchanged any written statement of physical condition of the premises with the plaintiffs. The defendant also appears not to have conducted any formal or systematic inspection of the properly. The lease further stated that the “[ljessee has examined and knows condition of premises, and has received same in good repair, except as otherwise specified in this lease, and no representations as to condition or repair thereof have been made by lessor or by lessor’s agent, prior to, or at execution of, this lease.” (Ex. 1, Part A, clause 9.) The parties did not make any exception in the lease to any portion or part of the premises from the general description that the premises was in good repair. The lessee’s obligations to maintain the property were not contingent on his financial condition.
7. The defendant also assumed the responsibility to comply with all laws, regulations and ordinances, as the lease required that the lessee was “to observe and comply with all rules, regulations and laws now in effect or which may be enacted during the continuance of this lease by any municipal, county, state or federal authorities having jurisdiction over the premises, and to indemnify lessor for any damage caused by violation thereof.” (Ex. 1, Part A, clause 14.)
8. The lease also provided in case of breach by the lessee, that it “may be terminated by the lessor in the event of the breach of any of the agreements of lessee contained herein, which is not cured within 30 days of written notice to lessee, in which case lessor may reenter on the premises, and this lease shall immediately terminate.” (Ex. 1, Part A, clause 2.)
9. With respect to physical alterations of the premises, the lessor granted leave to the lessee to “make such alterations, additions or improvements in such parts of the building as lessee deems necessary.” (Ex. 1, Part B, clause 1.) The lessor was allowed to make repairs in the event of the failure of the lessee to do so and to add the cost of such repairs to the rent then due. (Ex. 1, Part A, clause 8.) In the event the lessee contracted for the “construction, repair or improvements on, in, of or to the premises, or any part thereof, or for any work to be done or materials to be furnished on or to the premises,” the lessee was to ensure that such contractors waived any rights to mechanics’ or materialmen’s liens. (Ex. 1, Part A, clause 15.) The lease did not reserve in the lessor any right of approval for any repair or construction on the premises, nor did it expressly make exception from the lessee’s financial burden for structural repairs, beyond that of destruction of the premises caused by fire, the elements or any other cause. Given some responses by Nigro to letters sent by Bell, and his letters to the City of Worcester Board of Health, discussed below, the defendant recognized his potential financial exposure for structural repairs. (See his letter of May 1, 1997, for example, in which he refers to structural integrity.)
10. Beginning by a letter dated April 1, 1997, the plaintiffs began to notify the defendant of a variety of maintenance issues, including broken, missing or rotting structural elements of the building, especially that of the exterior stairways and porches. This first complaint consisted of the following list [with Nigro’s May 1, 1997 response to each item in parentheses]:
a. Soffit needs replacement and repair: (soffit is in same condition as in beginning of lease and is not endangering the safely of the tenants and is only for decorative purposes);
b. Porch roof overhang needs plywood replaced and rolled roofing where now missing: (although cited condition is same as in beginning of lease, believed affected future integrity of structure and had roof repaired);
c. Underside of porch roof is falling down and need repair and painting: (same condition as in beginning of lease, but since the elements caused further decay, the two sections have been fully repaired);
d. Vinyl siding in numerous places on porches is loose or missing and needs repair and replacement: (winter elements tore off some siding and it was repaired):
*700 e. The white decorative, 2x4 panels under windows are exposed bare wood in places and need to be primed and painted or replaced: (same condition as in beginning of lease):
f. Some portions of downspouts are missing or damaged and needs to be addressed: (same condition as in beginning of lease and as they do not affect integrity of building, not obligated to replace);
g. Support post on lower level on Rugby Street side of building has been moved out of plumb and appears to no longer be supporting part of the porch: (has been addressed).
11. On June 10,1997, Nigro reported that, notwithstanding his first response, he had repaired the items that he did not believe he was responsible for (items a, e and f in paragraph 10, above).
12. On June 21, Bell wrote to Nigro complaining of a number of new maintenance concerns [with Nigro’s July 14th reply following each item in parentheses]:
a. Presence of an abandoned refridgerator: (no longer present upon inspection);
b. Missing screen door on many apartments: (not all tenants want screen door, but provides to all that do);
c. Graffiti and gouges in area of rear porches: (not expressly addressed but refers to porches being found in sound condition with any defects to be dealt with as necessary);
d. Missing corner molding on second floor, rear, porch/hallway area: (not specifically addressed):
e. Damaged siding: (will be dealt with in accordance with Nigro’s regular maintenance schedule):
f. Weeds growing at junction of parking lot and foundation of building: (found no excessive weeds);
g. Barrier protection missing and needs replacement: (planks attached to posts found to have been in deteriorated condition at commencement of lease and removed, since unsightly and added no protection and that posts were sufficient);
h. Chipped and peeling paint in various locations, including porches and porch floors, roof overhang, ceilings at hallway doors on all three floors, porch overhangs, rear entry doors, expressing concern that chipped and peeling paint affects integrity of lead paint compliance certification, and insisting upon proof of continued compliance: (will address as part of routine maintenance, as none seen as material defects warranting immediate attention; lead paint not addressed specifically);
i. Tripping hazard on floor outside apt. #9 and porch may have some rot: (see response to “c” above):
j. Sliding screen door missing in two apartments and one apartment missing screen window: (sliding screen doors may have fallen out of track but all are present; tenant wanted window screen removed to install air conditioner).
The plaintiffs notified Nigro of their intention to terminate the lease if the defects noted were not remedied in 30 days.
13. On August 6, 1997, the plaintiffs caused aletter of termination of lease to be sent by their attorney to Nigro for his failure to make necessary repairs to the property in violation of clauses 5, 6, 7 and 14 of Part A of the lease, although no specific conditions were noted. On August 12, 1997, the defendant, through counsel, wrote in response and denied violation of the lease, asserting that he has made all necessary repairs, and intending to enforce all his rights under the lease.
14. The plaintiffs commenced this lawsuit on December 5, 1997.
15. On October 19, 1998, the Department of Code Enforcement of the City of Worcester cited the parties for a serious violation[1] of the state Sanitary Code, listing as a specification that the “floorboards and stairtreads on rear porches and Rugby Street side stairway and porches are rotted and either unpainted or peeling in areas. Rotted sections must be replaced and all wood treated to prevent rot and decay.” (Attachment to exh. 10.)
16. In August and December 1998, Nigro caused letters to be sent to the code enforcement office and health department that admitted of his control of the property and his responsibility to make repairs. However, he was then financially unable to pay for the repairs. In September 1999, a structural engineer apparently retained by the plaintiffs reported serious loss of structural support in the wooden elements of the porches. (Exh. 28.) Thereafter, in 1999, due to the cited condition having remained uncorrected, the city of Worcester brought an action of enforcement in the Housing Court, which, on November 15, 1999, entered an injunction against the defendant from failing to comply with the order of the city and ordering him to do all things necessary to bring the premises into conformity with the State Sanitary Code and to maintain it in that manner. Further inaction with respect to the cited defect led to an agreement of the parties, without waiving any rights each may have in the lease or their positions in this case, to allow a receiver to be appointed, authorized to collect rents and to make necessary repairs therefrom.[2]
17. In late 1999 (the evidence does not reveal the precise date, but it was approximately at the same time as the entry of the injunction in the Housing Court), the defendant Nigro gave notice to the plaintiffs of his intention to exercise the option to purchase the property. He reasoned that if he was going to put substantial funds into the building, he wanted to own the building. He applied for conventional bank financing for an amount sufficient to make the purchase and to do all necessary structural repairs. His exercise of the option was rejected by the plaintiffs, on the ground that they had previously terminated the lease for *701 Nigro’s uncorrected violations of lease. Nigro’s application for financing was, thereafter, rejected. Notwithstanding the expiration of the 5-year term of the lease, the defendant appears to remain in physical control of the property, subject to the receivership.
DISCUSSION
This case involves a claim by the plaintiffs of an alleged breach of lease on the part of the defendant for failure to keep the plaintiffs as named insured on the insurance policy, for failure to keep the property maintained in the same condition at the outset and for failure to comply with orders of the code enforcement department of the City of Worcester;[3] this claim is countered by the defendant that the plaintiffs breached the terms of the lease in their refusal to honor the defendant’s rights under the option to purchase clause.[4] In addition, the defendant claims that Bell has complained of trivial violations of the lease in order to manufacture a breach of lease and to regain the properly, now that the defendant had improved the property significantly. The plaintiffs seek to establish, by declaratory and equitable orders and judgment, their rights of possession of the property and monetary relief as well. The defendant seeks enforcement by specific performance of his right to acquire the property, as well as monetary relief.
The parties do not contest the existence or validity of the lease between them, nor its terms or their interpretation. The issues joined for trial and determination are whether there have been any breaches of the lease and, if so, their impact upon the viability of the lease and the defendant’s purported exercise of the option to purchase.[5] The plaintiffs contend that the defendant materially breached the lease and that, as a consequence, they properly gave the defendant notice of termination of it in 1997, warranting a return of the property to them, along with an award of money damages for rent retained by the defendant after the termination and for waste committed by the defendant. Nigro counters this contention by claiming that any breaches committed by him were immaterial, that the plaintiffs have not been harmed and that his acts and/or omissions do not warrant the forfeiture of his leasehold and his exercise of the option to purchase. Moreover, he contends that the plaintiffs have violated the implied warranty of good faith and fair dealing by hypertechnical criticism of his performance pursuant to an ulterior plan to reclaim the premises and become unjustly enriched by his expenditure of money and effort that has resulted in a significant improvement in its condition and value.
Traditionally, Massachusetts law has held that a “material breach of contract by one party excuses the other party from performance as a matter of law.” G.M. Abodeely Ins. Agency, Inc. v. Commerce Ins. Co., 41 Mass.App.Ct. 274, 278 (1996). “Whether a breach is material or immaterial normally is a question for the [fact finder] to decide. 6 Williston, [Contracts] §841, at 159 ... A material breach of an agreement occurs when there is a breach of ‘an essential and inducing feature of the contract.’ ” Lease-It, Inc., v. Massachusetts Port Authority, 33 Mass.App.Ct. 391, 396 (1992). “When a party to an agreement commits an immaterial breach of that agreement, the injured party is entitled to bring an immediate action for damages; it may not stop performing its obligations under the agreement.” Lease-It, Inc., id., at 396, citing Farnsworth, Contracts §8:16, at 442 (1990).[6]
Turning first to the alleged violation of the insurance clause, there is no question but that the defendant failed to maintain the plaintiffs as insureds under the insurance policy for a closed period of time from January 1996, until May 1997. As the defendant has noted, “equity does not favor a forfeiture.” Howard D. Johnson Co. v. Madigan, 361 Mass. 454, 456 (1972), citing Judkins v. Charette, 255 Mass. 76, 83 (1926). The court, in Howard D. Johnson Co., id., approving equitable relief against a forfeiture, stated: “the breach did not prejudice the [lessor] and the [lessee] demonstrated good faith in its subsequent substantial compliance.” Id. at p. 458-59. The court also said:
Relief against forfeiture has been granted although a lessee has failed to pay rent at the times and in the manner designated by the lease and even if such failure has been wilful and intentional, or where the lessee has breached a collateral covenant to repair or to furnish fire insurance and such breach has been due to accident or mistake and no harm has resulted to the lessor, or where, if the lessor was harmed, the damage could be readily ascertained and compensation paid so that the lessor would be put in the same position as if no such breach had occurred. But where the conduct of the lessee has been such as not to commend itself to a court of equity or where the circumstances of a particular case are such that the granting of relief would impose an unjust and unreasonable hardship on the lessor, then a forfeiture has not been set aside.
Howard D. Johnson Co., supra, at 457, quoting from Eno Sys., Inc. v. Eno, 311 Mass. 334, 338 (1942). I find that the omission of the plaintiffs from the insurance policy to have been inadvertent and caused by the insurance agent and not the defendant. The mistake was rectified. The plaintiffs were not harmed. This is similar to the issue decided in the case of Mactier v. Osborn, 146 Mass. 399 (1888). The breach is thus immaterial and the defendant has satisfied his burden to prove entitlement for relief from forfeiture on account of this mistake.[7]
The more difficult issue that this case presents is whether the defendant breached the lease by failing to comply with the lease requirements to keep the premises maintained in the condition it was at the commencement of the lease and failing to comply with applicable laws and regulations, particularly by his alleged failure to maintain and/or repair porch deck *702 ing and stairs and, if so, whether this constitutes a material breach of the lease that would excuse the plaintiffs from further performance under the lease and justify their rejection of the defendant’s attempted exercise of the option to purchase the premises.[8]
The condition of the porches was an on-going issue between the parties. The plaintiffs complained to the defendant by letters of April 1, and June 21,1997 that there were portions of the porches in need of paint, that they were otherwise exposed to the elements or were already showing signs of rot. The defendant responded that he had either repaired the conditions or did not believe that such defects were affecting the soundness of the structure and would take care of the problems in accordance with his maintenance schedule, but generally noting that he believed the porches to be of sound quality. However, the city’s code enforcement office gave notice of a serious violation of the State Sanitary Code[9] with respect to the porches in October 1998, resulting in an order to the defendant, issued by the Housing Court in 1999, for repair and, thereafter, for the appointment of a receiver to collect rents and to make necessary repairs therefrom.
The notice of violation and order for remediation that was issued by the code enforcement department of the city of Worcester cited structural defects that exposed the parties to the enforcement actions by the city and the potential for liability due to injury.[10] Moreover, the plaintiffs were committed by the lease to provide secondary financing to the defendant in an amount not to exceed $75,000.00, in the event he chose to exercise the option to purchase. The structural integrity of the building has an obvious and direct bearing upon the quality of the plaintiffs’ investment, whether the property was sold to Nigro or not.[11] More importantly, if the defendant decided not to exercise the option, the plaintiffs were entitled to a return of the premises to them in the same condition as it was when leased to Nigro, reasonable wear and tear excepted. Since the lease was drafted by the defendant’s attorney,[12] and since the defendant agreed to the general good condition of the building in October 1995, without specifically referencing any defects in the premises, he has no basis to complain that he is being required to repair substantial defects that were present at the commencement of the lease.
In a case in which an equitable remedy was sought and obtained to restrain the forfeiture of a lease due to the alleged failure to maintain and repair a leasehold, the court stated that “[f]orfeiture will not be declared because of a want of repair which is not substantial, or is of a trifling character.” Kaplan v. Flynn, 255 Mass. 127, 130 (1926). The court went on to relate this principle to the facts therein:
The defendants at this time knew of the condition of the theater and no complaint was then made and there was no evidence that during the interval from March 1924, until May 15, 1924, when the lessors notified the lessee it had that day entered upon the premises and taken possession, that there was any substantial change in the condition of the theater.
Under these circumstances the lessor cannot take advantage of the alleged defects, at least without prior notice to the lessee, giving him a reasonable opportunity to make the necessary repairs. As there was an extension of a valuable leasehold, advance rent being accepted and no complaint made of the condition of the property, or want of repair, justice requires that before the plaintiff [lessee] is deprived of his property, he should be notified of the defects relied on. Equity relieves against a forfeiture where no real fault is committed, or the breach is induced or waived by conduct, as well as when by accident or mistake there has been a breach of some collateral covenant, such as to repair or insure, and where the lessor may be placed in the same position as if the breach did not occur, by an award of damages or otherwise.
Kaplan, supra, at 131. Likewise, in Lundin v. Schoeffel, 167 Mass. 465 (1897), the court affirmed an equitable restraint of a forfeiture of a lease that had been sought for a delay in commencing the “fitting-up” of the subject premises, finding that the delay was neither wilful nor in bad faith nor had the lessor complained of the delay or harmed as a result.
Here, however, the facts are not as forgiving for the defendant/lessee as were found in Kaplan, Mactier and Lundin. The plaintiffs first gave notice to the defendant to make repairs to the porches, including having informed him of the presence of rot, in July 1997. This was following a reference to the porches in April. By October 1998, the code enforcement department deemed the state of the porches to be of such concern so as to potentially endanger the health and safety of the occupants and so notified the defendant. By November 1999, an injunction had entered against the defendant ordering him to comply with the order of the code enforcement office. Thereafter, although it is unclear in the evidence as to precisely when, the property was placed into receivership, by agreement, so as to allow the porches to be repaired from rents as collected. The parties stipulated that the cost of repairs already paid exceed $50,000.00, and that another $13,000.00 is due to be paid. Therefore, the repairs at issue are neither trifling nor minor but are substantial. Moreover, the defendant was placed on early notice of a deteriorating condition, no doubt exacerbated by a failure to keep the wooden elements sealed against the weather. After having been so notified, the defendant failed to take appropriate action to adequately maintain the porches and allowed them to become sufficiently dangerous so as to be of concern to the code enforcement office of the city one year later.
The plaintiffs have satisfactorily shown a causal link between their complaints of June 21, 1997, their notice of termination in August 1997, and serious *703 defects noted following the defendant’s failure to cure after being placed on notice. Notwithstanding that the complaints and actions taken by the City of Worcester code enforcement department followed the notice of termination of lease and the commencement of this suit, such complaints and actions are probative of the substance and seriousness of the plaintiffs’ complaints with Nigro and the deficiencies in his response thereto.[13] The complaint by code enforcement in 1998 and the granting of an injunction in 1999 are not too remote in time. Under all the circumstances, therefore, the plaintiffs have sustained their burden to prove that the defendant is at fault for a material breach of the lease that was neither induced nor waived by the lessor, nor was it a collateral breach created by accident or mistake, and that it was properly terminated. Consequently, the defendant has forfeited his rights under the lease, entitling the plaintiffs to ownership and possession of the premises forthwith, subject to the receivership. The defendant is not entitled to specific performance.
With respect to plaintiffs’ claims for monetary damages, assuming that such a demand remains as a viable prayer for relief,[14] the evidence was unclear as to whether the defendant and/or the receiver had continued rental payments to the plaintiff, although I infer that the porch repairs have been paid from net profits. Moreover, the plaintiffs claim that they would have had the benefit of the rents collected since August 1997, had Nigro acquiesced to the termination of lease in a timely fashion, allowing the plaintiffs to resume control of the premises. However, they failed to prove any net damages, i.e., that rental income would have exceeded the payments due on their mortgage and the other expenses of the building including the cost of structural repairs likely necessary, at any point in time after the plaintiffs gave notice of lease termination. In addition, neither party provided evidence that the receiver has achieved any profit in the operation of the premises since appointment; it is reasonable to infer, and the inference is drawn that the receiver has obtained no profit, over and above funds being obtained to pay for the structural repairs.
Moreover, the plaintiffs have not shown that the defendant committed waste in any respect other than in the failure to repair the porches. Neither party offered evidence concerning the causal relationship between the costs of repair of the porches paid and to be paid by the receiver and the nature and extent of the defects noted in 1997. Given the notice of termination of lease sent by the plaintiffs in August 1997, the court further infers that had possession of the premises been returned to them in 1997, substantial expense would likely have been incurred and paid by the plaintiffs from rental income to bring the property into compliance with applicable codes. The plaintiffs have not shown that the extent of repairs undertaken by the receiver would not have been necessary had the defendant surrendered possession of the premises upon notice of termination. Indeed, given the engineer’s report to the plaintiffs in September 1999 (exh. 28), an inference is drawn that the cost of repairs would have been substantial in 1997. Consequently, the plaintiffs have not sustained their burden to prove entitlement to monetary damages for breach of contract/breach of lease or under any other theory pursued by the plaintiffs and supported in the evidence.
Each party has alleged that the other violated the provisions of G.L.c. 93A. In light of the commercial nature of the transaction, and the fact that neither party introduced any evidence of demand procedures having been followed under the provisions of c. 93A, §9 thereof, the parties are deemed to be seeking relief, if at all, pursuant to §11. Given the decision of the court with respect to the breach of lease, the defendant has failed to sustain his burden of proof with respect to his claim against the plaintiffs for a violation of this statute.
The plaintiff has the burden of proving that the defendant committed an unfair or deceptive act or practice. G.L.c. 93A, §§2 and 11. A “deceptive” act or practice is one which has the capacity to deceive. An act or practice is deceptive if it could reasonably cause a person to act differently from the way he would act if he knew the truth about the matter. Purity Supreme v. Attorney Gen., 380 Mass. 762, 777 (1980), quoting Lowell Gas Co. v. Attorney Gen., 377 Mass. 37, 51 (1979). It includes any communication made with the intent to deceive another person, but intent to deceive is not always necessary. Swanson v. Bankers Life Co., 389 Mass. 345, 349 (1983) (no intent to deceive need be shown). A negligent or careless misrepresentation of fact, the truth of which is reasonably capable of ascertainment is also a deceptive act or practice. Glickman v. Brown, 21 Mass.App.Ct. 229, 235 (1985). An act or practice is “unfair” if it was immoral, unethical, oppressive, unscrupulous or otherwise unconscionable. PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975), citing Federal Trade Comm’n v. Sperry Huchinson Co., 405 U.S 233, 244 (1972), citing 20 Fed.Reg. 8325, 8395 (1964). An act that might be unfair in a business transaction with an unsophisticated consumer might not be unfair when it takes place in a transaction between two sophisticated businessmen. Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 475, quoting Spence v. Boston Edison Co., 390 Mass. 601, 616 (1983). Neither negligent acts, standing alone, nor breach of contract constitute proof of an unfair or deceptive act or practice. Swanson v. Bankers Life Co., supra at 349 (“not every negligent act is unfair or deceptive...”); Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 100 (1979) (breach of contract alone does not amount to unfair act or practice). The plaintiff must prove that the negligence or breach was motivated by some “pernicious purpose,” was unfair or could reasonably cause *704 a person to act differently from the way he would act if he knew the truth about the matter. Purity Supreme, Inc. v. Attorney Gen., supra at 777, Framingham Auto Sales v. Workers’ Credit, 41 Mass.App.Ct. 416, 418 (1996). Lastly, the plaintiff must prove that the unfair or deceptive act or practice of the defendant caused damage. Martha’s Vineyard Auto Village, Inc. v. Newman, 30 Mass.App.Ct. 363, 368-69 (1991), rev. denied, 409 Mass. 1105 (1991).
Although the plaintiffs have proven that the defendant materially breached the lease, there has been no evidence introduced that would provide a basis to find that the defendant’s actions were “immoral, unethical, oppressive, unscrupulous or otherwise unconscionable” or motivated by some “pernicious purpose”; therefore, they have failed to sustain their burden to prove that the defendant acted unfairly or deceptively.
Lastly, with respect to the defendant’s claim under the provisions of G.L.c. 237, §16-18, the defendant has not proven that any improvements he made were not required under his responsibility to maintain the premises under the lease. He has, therefore, failed to satisfy his burden to prove entitlement to such damages.
ORDER FOR JUDGMENT
For the foregoing reasons, judgment shall enter for the plaintiffs, declaring that the lease between them and the defendant was properly terminated due to a material breach by the defendant and that the plaintiffs are entitled to ownership and possession of the premises at 3-5 Rugby Street, Worcester, Massachusetts, free and clear of any claim of right by the defendant to purchase under the lease. The judgment shall also declare that the defendant’s claim of right under the lease, including under the option to purchase is declared to be forfeited and is extinguished. Judgment of dismissal shall enter on the counterclaim and on all claims of the plaintiff for monetary damages. The plaintiffs shall be awarded their costs of suit

This violation was further denoted as it “may endanger or materially impair the health or safety of persons occupying these premises for dwelling purposes.”

Neither party offered evidence as to whether the rental payments due from the defendant to the plaintiffs for payment on their mortgage have been kept current, although an inference is drawn that the repairs have been made from profit.

The body of the plaintiffs’ complaint does not delineate among causes of action. Their prayers for relief set forth claims sounding in declaratory judgment, G.L.c. 93A, breach of contract, trespass, waste and equitable relief regarding possession, ownership and rents.

The defendant’s counterclaim, as amended, is in three counts: for specific performance, for a violation of G.L.c. 93A, and an action, in the alternative, under the provisions of G.L.c. 237, §17, for the value of improvements made by him under his leasehold, should his claim for specific performance fail.

Notwithstanding the substantive contention of the plaintiffs that Nigro has forfeited his option to purchase by his breach of lease, at trial the Bells conceded that there was no issue with respect to the manner or form in which defendant exercised the option to purchase.

Under the recent case of Wesson v. Leone Enterprises, Inc., 437 Mass. 708 (2002), it appears that even an immaterial breach could potentially lead to a termination of the lease, if found to be a mutually dependent covenant, i.e., “a promise that was a significant inducement to the [non-breaching party’s] entering the lease in the first instance.” At. p. 722.

One evidentiary issue that arose during trial and for which the court requested post-trial briefing is the admissibility of a letter obtained by the defendant from a co-worker of the parties, apparently written by the plaintiff George Bell to his former attorney. The plaintiff objects to its admissibility, citing attorney-client privilege. The defendant urges its admission on the ground that the plaintiff did not satisfactorily show that he took reasonable precautions to ensure its confidentiality. How the co-worker obtained the letter was never explained. The party who seeks its exclusion has a burden to show that reasonable precautions were taken. In Re Reorganization of Electric Mutual Liability Ins. Co. Ltd., 425 Mass. 419, 423 (1997). The plaintiff has not done so. He is therefore deemed to have waived his privilege regarding this letter and it is accepted as an exhibit for trial.

Similar to the issue of insurance, the failure of the defendant to maintain the integrity of the lead paint certification is viewed as an immaterial breach, one that the plaintiffs were authorized by the lease to correct and pass the cost to the defendant as additional rent, which was done, amounting to a cost of $900.00.

One that “materially affects the health and safety of the tenants.” See notice of violation of the Code Enforcement Dept, of the City of Worcester.

The inspection agency’s designation of the violation as one that “may endanger or materially impair the health and safety of the tenants” triggers exposure to potential liability to the tenants under rent withholding (see G.L.c. 239, §8A), to enforcement actions brought by the board of health and/or tenants under G.L.c. 111, §127C and to self-help repairs by tenants under c. 111, §127L.

Although the plaintiffs’ mortgage was not introduced into evidence, it is within the general knowledge of most laymen that commercial mortgages require the property to be maintained so that the value of the collateral is not diminished.

The lease draftsman was not defendant’s trial counsel.

The defendant sought a ruling in limine, regarding the admissibility of the property being placed into receivership for purposes of repair of the porches, given the agreement between the parties to do so. The parties at trial stipulated to the amount of the repairs paid by the receiver and yet to be paid. The court has not attributed fault to the defendant from the fact of an appointment of a receiver and, to that extent, the motion is allowed. However, to the extent that the motion seeks to exclude evidence in connection with the condition and/or need for the repair of the porches at that point in time, it is denied.

Judging by the way in which the case was tried, it appears that the parties narrowed the ultimate issues to be tried and decided to the cross-theories of equitable relief, namely, whether the plaintiffs were entitled to a restoration of their possession of the premises, on one hand, or whether the defendant was entitled to specific performance of the option to purchase the property on the other.