LEASE-IT, INC. *vs.* MASSACHUSETTS PORT AUTHORITY.

No. 89-P-1093.

Suffolk. November 20, 1991. - October 8, 1992.

Present: ARMSTRONG, SMITH, & IRELAND, JJ.

*Contract*, Performance and breach. *Damages*, Breach of contract.

On a claim by an automobile rental concessionaire against the operator of an airport, alleging that the defendant breached the parties' concession agreement by closing a certain access road to the airport (conduct found by the jury to be an immaterial breach), this court concluded that the plaintiff would be entitled to damages only for the period between the time when the defendant closed the access road and the time when the plaintiff materially breached the agreement by ceasing payment of the concession and rental fees due the defendant thereunder. [396-397]

CIVIL ACTION commenced in the Superior Court Department on November 21, 1983.

The case was tried before *Barbara J. Rouse*, J.

*Scott P. Lewis (Kenneth W. Salinger* with him) for the defendant.

*William H. Carroll (Antonette S. Fernandez* with him) for the plaintiff.

SMITH, J. Since 1974, the plaintiff, Lease-It, Inc., doing business as Ajax Rent-A-Car, Inc. (Ajax), has been engaged in the car rental business at 161 Porter Street, East Boston, near Logan International Airport (the airport). The defendant, Massachusetts Port Authority (Massport), is the proprietor of the airport.

In 1978, Ajax signed a "curbside" agreement with Massport. The agreement allowed Ajax to drive its "courtesy buses" to the airport, park at the various terminals, pick up its customers, and drive them to Ajax's facilities at Porter and Orleans Streets where the rental vehicles were parked.

The customers would also return the vehicles to Ajax's facilities and be driven back to the airport. Porter Street in East Boston provided direct access to the airport from Ajax's facilities, and, by using that street, it would take Ajax about three to five minutes to reach the airport.

At the time that Ajax entered into the curbside agreement, it did not have counter space at the various airport terminals. However, on July 1, 1982, Ajax entered into a concession agreement (agreement) with Massport for the "non exclusive right to conduct an auto rental business at the [a]irport." According to the agreement, Ajax was allowed to establish counters at the airport terminals from which to conduct its business. In return, Ajax agreed to pay Massport annual concession and rental fees on a monthly basis, calculated under a precise formula. In the agreement, Ajax acknowledged that "from time to time it may be necessary for [Massport] to undertake construction, repair or other activities related to the overall management of the [a]irport which will require temporary accommodation by [Ajax]." It agreed "to accommodate [Massport] in such matters" and that, "[e]ven though such activities may inconvenience and partially impair [it], . . . no liability shall attach to [Massport] . . . by reason of such inconvenience or impairment." Ajax agreed to waive any right to claim damages or other compensation "from such inconvenience or impairment . . . ."[1]

In early November, 1983, Massport announced that it intended to close Porter Street by erecting barriers at the perimeter of the airport. According to Massport, the barriers were part of a traffic plan designed to improve the traffic flow at the airport and to reduce the impact of airport-generated traffic on adjacent East Boston neighborhoods. On November 21, 1983, as a result of Massport's announcement, Ajax filed a two-count complaint against Massport in the Superior

---

[1]The agreement did state, however, that if Massport did "undertake construction, repair or other activities related to the overall management of the [a]irport" which required "temporary accommodation by [Ajax]," then Ajax would be entitled to a "reasonable proportionate abatement of the annual minimum guarantee during periods of substantial impairment of [Ajax's] revenues as determined solely by [Massport]."

Court. In Count I of its complaint, Ajax alleged that, by closing Porter Street and thereby preventing Ajax from having direct access to the airport from its East Boston location, Massport had committed a breach of its agreement with Ajax. Count II of the complaint alleged that the decision by Massport to close access to the airport from Porter Street was arbitrary and capricious. The complaint requested, among other things, that the court grant a preliminary injunction against Massport, enjoining it from closing Porter Street. On November 23, Ajax's request was denied. On November 28, Massport closed Porter Street. Ajax then refused to pay the monthly concession and rental fees due on the first day of December.

Despite Ajax's refusal to pay its monthly concession and rental fees, Massport did not close Ajax's counters at the various terminals or otherwise rescind the agreement.[2] Rather, during the following months, the parties engaged in a series of discussions regarding the status of Porter Street.

In June, 1984, as a result of the ongoing discussions, the parties entered into an agreement under which Massport agreed to construct a swinging gate at the Porter Street barriers, thereby providing Ajax with direct access to and from the airport. Ajax, in return, agreed to resume paying its concession and rental fees and released Massport from any claims against it by Ajax for future damages. The parties acknowledged that there was a pending action by Ajax against Massport for the closing of Porter Street and a claim by Massport against Ajax for monthly concession and rental fees. There was nothing in the agreement indicating that the parties waived their respective claims.

In September, 1986, Massport filed a counterclaim seeking from Ajax payment of the monthly concession and rental fees it had previously refused to pay. Ajax then filed an amended complaint raising contract (Count I) and constitutional (Count II) claims. Before trial, however, Ajax stipu-

---

[2]Ajax carried on its rental business as before. However, the new route added several minutes to the trip from Ajax's facility to the airport, and Ajax claimed to have lost business as a result.

lated to the dismissal of its constitutional claims. Therefore, the only issues for trial were Ajax's claim that it was entitled to damages which resulted from the closing of Porter Street up to the date of the 1984 agreement and Massport's counterclaim that Ajax owed it concession and rental fees for the period of December, 1983, through June, 1984.

Upon Massport's motion, the trial was bifurcated into liability and damages phases. At the close of Ajax's evidence during the liability phase, Massport moved for a directed verdict on Ajax's claim and in favor of Massport on its counterclaim. Massport's motion was denied. The judge submitted two questions to the jury. They were: (1) did Massport commit a breach of its agreement with Ajax by closing the Porter Street access to the airport, and (2) did Ajax commit a breach of its agreement with Massport by refusing to pay the concession fees? The judge instructed the jury that, in order for Ajax to prevail on its claim, it must prove that Massport, by closing Porter Street, committed a breach of either an express provision in the agreement or of the implied covenant of good faith and fair dealing. The judge also specifically instructed the jury that if they determined that the Porter Street closing was a *material* breach of the agreement they must answer "no" to the question whether Ajax, by refusing to pay the concession and rental fees, had also committed a breach of the agreement. The jury answered "yes" to both questions, thereby determining that Massport, by closing Porter Street, had committed an *immaterial* breach of the agreement, and that Ajax had, in turn, also committed a breach of that agreement. The jury were not asked to characterize Ajax's breach as material or immaterial.

The matter then proceeded to the damages phase. Because of the June, 1984, agreement between the parties, Ajax's proof of damages was limited to the period between the closing of Porter Street and the date of the 1984 agreement. Similarly, because Ajax resumed paying its concession and rental fees in July, 1984, Massport's counterclaim was limited to the period from December, 1983, through June, 1984.

The issue of damages was submitted to the jury by special questions. The jury were asked to determine if the closing of Porter Street was "an activity relating to the construction, repair or overall management of the [a]irport which required temporary accommodation by Ajax." If the answer was in the affirmative, the jury were instructed that Ajax's damages were limited to a "reasonable proportionate abatement" of its annual minimum guarantee during the period of the impairment of its revenues. (See note 1, *supra*.) If Massport's action in closing Porter Street was not related to Massport's over-all management of the airport, the jury were instructed that Ajax was entitled to damages in an amount that would place it in the same position as before Massport's breach of the agreement. The jury were also instructed that the time period during which the measure of damages was to be considered was from Massport's breach of the agreement in November, 1983, to June, 1984, the date Ajax signed the agreement waiving any claim of future damages. The jury found the closing of Porter Street was not related to Massport's over-all management of the airport; they found in favor of Ajax in the amount of $225,000. They also returned a verdict in favor of Massport in the amount of $105,621.95, the amount owed in concession and rental fees by Ajax to Massport for the period from December, 1983, through June, 1984. Judgment was entered on September 6, 1988.

Massport timely filed a motion for judgment notwithstanding the verdict or a new trial on Ajax's claim. Its motion was denied. Massport filed a notice of appeal. Ajax did not appeal from the judgment entered against it concerning the concession and rental fees it owed to Massport.

On appeal, Massport claims, among other things, that the judge committed error in denying its motions for directed verdicts and judgment notwithstanding the verdict. In particular, it argues that Ajax was barred, as matter of law, from recovering any damages for Massport's immaterial breach of the agreement because Ajax, by not paying its concession and rental fees, committed a material breach of the agreement.

1. *The effect of Ajax's breach on its damage claim against Massport.* According to the jury, Massport committed an immaterial breach when it closed Porter Street in November, 1983. When a party to an agreement commits an immaterial breach of that agreement, the injured party is entitled to bring an immediate action for damages; it may not stop performing its obligations under the agreement. Farnsworth, Contracts § 8:16, at 442 (1990) (injured party may sue for partial breach but must continue to perform or risk being in breach itself). "[O]nly a material breach of a contract . . . justifies a party thereto in rescinding it." 6 Williston, Contracts § 829 (3d ed. 1962).

Here, Ajax did bring an action for damages but also stopped paying its concession and rental fees; according to the jury, the failure to pay constituted a breach. The jury, however, were not asked to characterize the breach as material or immaterial. Massport argues that Ajax's action was a material breach, as matter of law and, therefore, that Massport was relieved of paying any damages to Ajax for its (Massport's) breach.

Whether a breach is material or immaterial normally is a question for the jury to decide. 6 Williston, *supra* at § 841, at 159. On this record, however, we may decide the matter on our own.

A material breach of an agreement occurs when there is a breach of "an essential and inducing feature of the contract[ ]." *Bucholz* v. *Green Bros.*, 272 Mass. 49, 52 (1930). Under the agreement, Ajax's sole obligation was to pay concession and rental fees to Massport. Ajax admitted that it refused to pay the fees. That refusal "was a substantial breach going to the root of the contract . . . ." *Aerostatic Engr. Corp.* v. *Szczawinski*, 1 Mass. App. Ct. 141, 145 (1973). We hold that Ajax, by refusing to pay the fees, committed a material breach of the agreement. Our ruling that Ajax committed a material breach does not prevent it, however, from having the jury pass on the question as to whether it should receive damages for Massport's breach, but it does

limit the time frame that may be used by the jury to measure those damages.

Generally, where both parties commit a breach of the agreement, each party has the right to claim damages. *Minot* v. *Minot*, 319 Mass. 253, 270 (1946). 4 Corbin, Contracts § 946 (1951). Here, both parties did commit a breach of the agreement, but the breaches were of a different character — Massport's breach, immaterial, Ajax's breach, material. "It is well established that a material breach by one party excuses the other party from further performance under the contract." *Ward* v. *American Mut. Liab. Ins. Co.*, 15 Mass. App. Ct. 98, 100 (1983), citing *Quintin Vespa Co.* v. *Construction Serv. Co.*, 343 Mass. 547, 554 (1962); *Petrangelo* v. *Pollard*, 356 Mass. 696, 701-702 (1970). Once relieved from performance, the injured party is not liable for further damages incurred by the party in material breach. See *Aerostatic Engr. Corp.* v. *Szczawinski*, 1 Mass. App. Ct. at 145; *Ward* v. *American Mut. Liab. Ins. Co.*, 15 Mass. App. Ct. at 101.

Here, there was a period of time where Massport, alone, was in breach of the agreement. Ajax, despite its eventual material breach, still may recover damages from Massport for its breach; the measure of damages is limited, however, to the period between Massport's breach and Ajax's material breach. Therefore, there must be a new trial on the issue of damages.

2. *Other issues.* Massport's other issues raised on appeal do not need any exposition; we find them to be without merit. We note that Massport argues that Ajax cannot recover because its breach was wilful. That claim was not presented below, and we refuse to consider it on appeal. *Samson* v. *San-Land Dev. Corp.*, 17 Mass. App. Ct. 977, 979 (1984).

The matter is remanded to the Superior Court for trial on the issue of the amount of damages, if any, that Ajax shall receive from Massport.

*So ordered.*