van Gestel, J.
This matter is before the Court on the defendants’ motion for summary judgment on all counts of the plaintiffs’ complaint. Although the plaintiffs argue that there are factual disputes on certain issues, the following facts are not challenged.

BACKGROUND

In November 1997, a stock purchase agreement (the “Agreement”) was entered into between Concentra Acquisition Sub, Inc. as buyer and David V. Cardelle, Mark Friedman (“Friedman”) and Alan J. Gold (“Gold”) as sellers. Friedman and Gold are the plaintiffs here. Concentra Acquisition Sub, Inc. is a predecessor of Concentra Preferred Systems, Inc. (“Concentra”), a defendant here. The other defendant is Concentra Managed Care Services, Inc. (“CMCS”), a guarantor of Concentra’s obligations.
The object of the Agreement was the purchase from the sellers of all of the issued and outstanding capital stock of New England Medical Claims Analysts Corp., a Massachusetts corporation. This transaction closed on November 17, 1997. At that time, Concentra Acquisition Sub, Inc. was to pay the sellers $1.5 million, provide the sellers some stock and make a future contingent payment. The contingent payment was based upon the financial performance of the acquired company for a twelve-month period after its acquisition. The sellers were paid $1.35 million on November 19, 1997, and $150,000 was deposited with an agreed-upon escrow agent.
Section 3.3 of the Agreement reads:
Effect of Delays. Except as provided in Article 9, failure to consummate the Closing on the date and time and at the place selected pursuant to this Article 3 shall not result in any termination of this Agreement and shall not relieve any party to this Agreement of any obligation hereunder.
Article 9 is titled “TERMINATION,” and has three sections that read:
9.1 By Mutual Consent. This Agreement may be terminated without further obligation of the parties at any time prior to Closing by mutual consent of the parties hereto.
9.2 Damages. No party shall be liable in damages to any other party as a result of the failure to consummate the transactions contemplated by this Agreement unless such failure is caused by the material breach of such party of any of the terms of this Agreement.
9.3 Unilateral Termination. If, through no fault of or breach by the party seeking to terminate this Agreement, the Closing is not consummated on or before November 30, 1997, this Agreement may be unilaterally terminated by written notice given by such party to the other parties
The last sentence of Section 10.13 of the Agreement mandates that the “provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the parties as set forth in this Agreement."
On three occasions after the original closing, amendments to the Agreement were negotiated and executed. The sellers and the buyer were always represented by competent counsel in the negotiations and execution of the Agreement and each of the three amendments thereto. It is the application of the third amendment (“Amendment No. 3”) that is implicated in this lawsuit.
Amendment No. 3 was entered into as of September 1, 1999. The parties thereto were the same three sellers as in the original Agreement and Concentra. This amendment recites that Concentra Acquisition Sub, Inc. and the acquired company by then had been merged into Concentra, and the separate identities of those two prior entities ceased.
Amendment No. 3 also recites that it came about because Concentra requested an accommodation from the sellers due to changes then pending in its corporate structure and that the sellers were willing to make that accommodation. It was “for the purpose of making changes in the Amended Purchase Agreement, deemed necessary and desirable and in the best interest of [Concentra] and Sellers” that this Amendment No. 3 was executed.
Amendment No. 3 specifically states that the parties thereto reached their agreement “in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged ...”
Section 1(a) of Amendment No. 3 reads:
[Concentra] shall pay Sellers Two Million Seven Hundred Thousand Dollars ($2,700,000) (the “Interim Payment”) (plus interest at the Prime Rate from September 1, 1999, to the date of payment), in immediately available funds concurrently with the execution and delivery of this Agreement.
Section 4 of Amendment No. 3 reads:
Sellers’ Remedies for Breach. [Concentra] and Sellers acknowledge and agree that (a) [Concentra’s] billings related to the Contract Compliance Line of Business for the 1999 Period total $6,795,734, (b) the Baseline Amount in respect of the Contract Compliance Line of Business is $593,155, and (c) the Additional Product Line Revenue in respect of the Contract Compliance Line of Business is $6,202,579. In the event that [Concentra] fails to make any payment required pursuant to Section 1 as and when required, Sellers shall thereafter be entitled to demand and receive from [Concentra] an amount equal to $6,202,579, minus the portion of *266 the Interim Payment related to the Contract Compliance Line of Business, and minus any other amounts paid to Sellers pursuant to subsection (b)(i), subsection (c)(i), subsection (d)(i), subsection (e)(i), subsection (f)(i), and/or subsection (g)(i) of Section 1 of this Amendment.
Amendment No. 3 does not specify a precise date or deadline for the execution and delivery of the Agreement. The final version of this amendment was sent by counsel for Concentra to counsel for the sellers on September 24, 1999. The two lawyers then spoke over the telephone on September 27 and 28, 1999. During the second conversation, a plan for execution of the amendment was agreed upon. Gold would sign in Boston, the amendment would then be sent for signature to Friedman and Cardelle in Illinois, following which it would be sent to Concentra’s headquarters in Texas for the final signature. Concentra’s counsel would then send the fully executed amendment to the sellers’ counsel in Boston. The specific dates upon which any of these signatures would be obtained were not discussed.
On September 29, 1999, counsel for the sellers wrote a letter to counsel for Concentra, stating:
David [Cardelle] has arranged to have Steve Nelson sign the agreement and overnight it to Jim Greenwood for his signature on Thursday. Assuming that this all happens as planned, the funds can be wired on Friday.
If the plan does not unfold as hoped, please give me a call so that I can advise my clients of the delay.
Greenwood did not receive the amendment on Thursday, September 30, 1999. Rather, he received it on Friday, October 1, 1999. He signed on the same day. Counsel for Concentra then sent the executed amendment to counsel for the sellers by courier service for delivery on Monday, October 4, 1999.
Also on October 1, 1999, counsel for Concentra instructed Concentra’s finance department to wire the payment due to the sellers. That wire transfer did not occur until Monday, October 4, 1999. The amount wired was $2.7 million. It did not include the interest from September 1, 1999, to the date of payment.
On Thursday, October 7, 1999, counsel for the sellers wrote counsel for Concentra, stating:
Amendment No. 3 to the Stock Purchase Agreement executed by your client on October 1, 1999[,] required that the Interim Payment plus interest would be paid “in immediately available funds concurrently with the execution and delivery of this Agreement.” The Interim Payment was not made until October 4, 1999, and the interest component of the payment has never been made.
This failure to make the payment when required triggers the application of the Section 4 remedial provision of the Agreement. Pursuant to those provisions, demand is hereby made for the immediate payment of $4,334,662.00.
The full interest payment of $20,749.32 was made the next day, October 8, 1999. Section 6 of Amendment No. 3 provides:
Attorneys Fees. Promptly following [Concentra’s] receipt of a billing statement that details the services provided (and any related expenses) in reasonable detail . . . [Concentra] shall pay up to Fifteen Thousand Dollars ($15,000) in legal fees and expenses to Rubin & Rudman for work performed on Sellers’ behalf in connection with this Amendment and Performance Contingent Payment.
On November 1, 1999, counsel for the sellers sent counsel for Concentra a letter requesting a $15,000 payment of attorneys fees. The payment, in full, was made by a check sent on November 2, 1999.
The plaintiffs, Friedman and Gold, make no claims of any financial injury resulting from Concentra’s payments on October 4 and October 8, 1999. Indeed, they concede that they suffered none.
The complaint in this action was filed on March 22, 2000.

DISCUSSION

Summary judgment “shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Mass.R.Civ.P. Rule 56(c).
The complaint in this matter contains five counts: Count I — breach of contract (Amendment No. 3) by failing to pay both principal and interest on time; Count II — for breach of the obligation to guaranty performance under Amendment No. 3; Count III— Amendment No. 3 is not supported by consideration; Count IV — breach of the covenant of good faith and fair dealing; and Count V — for violating G.L.c. 93A by acting unfairly and deceptively. Counts I, II, IV and V all focus on the defendants’ alleged failure to perform under Amendment No. 3 by making late payments of principal and interest. Thus, for the most part, the Court will deal with them together.
Count III is different. It charges that there was no consideration for Amendment No. 3 and therefore that the plaintiffs are entitled to reform their prior agreement. It is pled in the alternative to Counts I and II, and it will be treated separately here. Also, because the other four counts are predicated upon a breach of Amendment No. 3, it seems appropriate to address Count III first because, if there was no consideration, then there is no third amendment.

Count III

Consideration is something that is given in exchange for an offer. Concentra must establish on the *267 undisputed facts here a benefit to the maker of a promise, or a loss, trouble, or inconvenience to, or a charge or obligation resting upon, the party to whom the promise is made. Congregation Kadimah Toras-Moshe v. DeLeo, 405 Mass. 365, 366 (1989). See Marine Contractors Co. v. Hurley, 365 Mass. 280, 286 (1974).
The Court observes that the parties to Amendment No. 3 recited that it was entered into "in consideration of the mutual covenants and agreements contained [t]herein and for other good and valuable consideration, the receipt and sufficiency of which [were] [tjhereby acknowledged.” The Court accepts the parties’ own statement that the amendment was supported by consideration. The Court cannot and should not re-write the contract. Further, judicial bias is towards interpreting a contract so as to make it an enforceable undertaking rather than one of no force and effect. Lafayette Place Associates v. Boston Redevelopment Authority, 427 Mass. 509, 517 (1998); Finn v. McNeil, 23 Mass.App.Ct. 367, 372 (1987).
Still further, Amendment No. 3, like the amendments that preceded it, continues in effect, unchanged, the original Agreement. Even a cursory review of the Agreement and the three amendments, including Amendment No. 3, amply demonstrates the kind of promise-for-promise situation that classically supports the consideration requirement for a contract.
There was consideration here and, thus, summary judgment for the defendants is warranted on Count III.

Counts I, II, IV and V

Success or failure of each of these four counts depends upon the effect of the timing of the payments made by Concentra when Amendment No. 3 was executed and delivered. Was the wiring of the principal amount of $2.7 million on Monday, October 4, 1999, and the payment of $20,749.32 in interest on October 8, 1999, timely or a breach, when the execution occurred on Friday, October 1, 1999, and the delivery thereof was by courier service on October 4, 1999? None of these facts is in dispute, and the contract (both the original Agreement and Amendment No. 3) is available to the Court for interpretation.
The Court begins its analysis by observing the significant fact that neither Amendment No. 3 nor the original Agreement contains any language making time to be of the essence in connection with the payments of either principal or interest under the amendment. When no express time limitation for the performance of an act under a contract is mandated and there is no recital that time is of the essence, the general rule is that a reasonable time to perform an act should be implied by the Court. Town of Middleborough v. Middleborough Gas & Elec. Dept., 47 Mass.App.Ct. 655, 658 (1999). When a contractual provision specifies that payment is due upon the occurrence of a contingency that is within the obligor’s control, the general rule is that payment is to be made within a reasonable time. Cavanagh v. Cavanagh, 33 Mass.App.Ct. 240, 242 (1992).
The original Agreement, in Section 10.13, a part that is continued in effect unchanged by Amendment No. 3, contains the parties’ mandate that the Agreement “shall be interpreted in a reasonable manner to effect the intent of the parties as set forth” therein. The intent of the parties, of course, was that Concentra purchase the sellers’ stock and make the payments agreed therefor.
The Court, in determining what is a reasonable time for payment in the situation before it, must consider various factors, including the nature of the contract, the probable intention of the parties, and the attendant circumstances. See, e.g., Alexander v. Berman, 29 Mass.App.Ct. 458, 461 (1990).
In this case, the sellers, by the inclusion of Section 4 in Amendment No. 3, clearly were intent upon having Concentra’s payment as “required pursuant to Section 1.” Section 1 called for payment “in immediately available funds concurrently with the execution and delivery” of the Agreement. The execution occurred on Friday, October 1, 1999, and the delivery was made by courier service from Texas to Boston on Monday, October 4, 1999. The principal payment of $2.7 million was made by wire transfer also on October 4, 1999. Wire transfer provides “immediately available funds.” Payment on October 4, 1999 complied with the contractual language for payment on execution and delivery. The latter words, “and delivery,” are entitled to have some meaning. No word or phrase of a contract should be considered meaningless. Lexington Ins. Co. v. All Regions Chemical Labs, Inc., 419 Mass. 712, 713 (1995).
Further, the Court notes the statement in the sellers’ counsel’s letter to counsel for Concentra of September 29, 1999, coordinating the multi-state contract execution and deliveiy minuet.
David has arranged to have Steve Nelson sign the agreement and overnight it to Jim Greenwood for his signature on Thursday. Assuming that this all happens as planned, the funds can be wired on Friday.
(Emphasis added.) This is almost exactly what occurred, with one slight change: Greenwood did not get the agreement for signature on Thursday; rather, it arrived on Friday. So, instead of wiring the principal funds on Friday, the next business day after the presumed signature date, as the sellers’ counsel stated in his letter, the funds were wired on the next business day after the actual signature date — Monday — and, consequently, this payment was made as the sellers’ counsel proposed.[1] There was no breach by Concentra with this payment and no basis for *268 triggering the draconian failed-payment clause in Section 4.
What then is the effect of the failure to pay the one month’s interest until Friday, October 8, 1999? Obviously, this was an unintentional oversight. A payment of the relatively insignificant amount of $20,749.32 in interest on a $2.7 million dollar principal payment arriving four days after the payment of the principal cannot be ruled to be a material breach of the Agreement or Amendment No. 3. The amount is less than 1 % of the total payment. And a payment four days after the contract’s delivery seems to fall well within the “reasonable time” requirements for this Agreement.
Further, Section 9.2 of the original Agreement, also a section that survives Amendment No. 3, recites that “no party shall be liable in damages to any other party as a result of the failure to consummate the transaction contemplated . . ., unless such failure is caused by the material breach of such party of any of the terms” of the Agreement. A material breach occurs when there is a breach of an essential and inducing feature of the contract. Lease-It, Inc. v. Massachusetts Port Authority, 33 Mass.App.Ct. 391, 396 (1992).
If the timing of the payment of interest was a breach — which this Court seriously doubts — it certainly was not a material breach. Gold and Friedman concede that they suffered no damages as a result of the payments not being received until October 4 and 8, 1999. The smallness of the amount involved, the indefiniteness as to when it was due, and the shortness of the delay show nothing more than a trifling breach. See National Machine & Tool Co. v. Standard Shoe Machinery, 181 Mass. 275, 279 (1902).
This Court concludes that Concentra neither breached its agreement with the sellers nor acted in bad faith or unfairly. There is, therefore, no foundation on which to ground Counts IV and V.
For the foregoing reasons, summary judgment is warranted for the defendants on Counts I, II, IV and V.

ORDER

Based on the analysis and review of the undisputed facts and the applicable law, this Court orders that summary judgment enter for the defendants on all counts of the plaintiffs’ complaint. Upon notice that any counterclaims are or have been resolved, final judgment may enter herein.

 The Court reminds the reader of this Memorandum that at an earlier time in the evolution of this transaction, there was a closing on November 17, 1997, followed by a payment of $1.35 million in connection therewith on November 19, 1997. The two business days from Monday, November 17, 1997, to Wednesday, November 19, 1997, seem to have passed without complaint.