Greco, J.
After a jury waived trial in this summary process action, the judge ruled that there was “no proper basis for termination ... of the lease” even though the lessee, defendant Peter Fiumara (“Fiumara”), had breached the lease. This is a Dist./Mun. Cts. R. A. D. A., Rule 8C, appeal of that ruling by the lessor, DiBella Realty Trust (“DiBella”).
Pursuant to the terms of the parties’ lease entered into in January of 2001, Fiu-mara leased the premises at 151 Rear Newbury Street in Peabody for an initial ten year term with options to renew for two additional five year terms. The premises consisted of a building and an adjacent parking lot. Contemporaneously with the lease, DiBella also sold to Fiumara the nightclub that had been operated on the premises. Fiumara paid $3.175 million for the business, of which $2.1 million was for a liquor license.
DiBella commenced this action to evict Fiumara for his violation of Paragraph 10 of the lease which provided that the lessee was not to “make structural alterations or additions to the Leased Premises without the express written consent of the Lessor, which consent... [was] not to be unreasonably withheld or delayed.” A separate paragraph, No. 17, of the lease provided that if the lessee defaulted in the observance of any lease covenant
and such default shall not be corrected within thirty (30) days after written notice thereof (or, in the event that such default is not susceptible to cure within such thirty (30) day period, such additional reasonable period of time as is necessary to cure such default, so long as Lessee has commenced the necessary curative action and diligently prosecutes such cure to completion) ..., then the Lessor shall have the right thereafter, while such default continues, to re-enter and take complete possession of the Leased Premises, [and] to declare the term of [the] lease ended....
The trial judge found that, after taking possession, Fiumara hired a contractor to demolish a 240 square foot shed which was in disrepair, was attached to the outside corner of the nightclub, and had been used to store empty bottles. It was to be replaced by an 840 square foot addition which was to have both a basement and access to the inside of the club. The proposed work, which would cost approximately $132,000.00, began in April, 2001. Fiumara did not obtain consent for this addition from DiBella. The lessor did not learn of it until May, when its trustee happened to drive by the site and observed the work in progress.
*17 Even though the trustee told the contractor that the work “looked good,” DiBella sent written notification on May 10th to Fiumara that he was in default of the lease for having failed to obtain consent before making structural alterations to the building. Fiumara was further advised that he had thirty days to cease all construction and “to replace the destroyed shed in the same or equivalent form.” In response, Fiumara’s attorney sent DiBella’s attorney a letter objecting to the notice of default. The letter also argued that the shed which had been removed was unsafe, that the new structure would be an improvement, and that DiBella would have consented to the work if asked to do so before construction began. That letter was followed by a formal request in writing, dated June 13, 2002, that DiBella consent to the structural alterations. DiBella’s response sought further information about the alterations, but at the same time asserted that Fiumara’s breach had not been cured and that “the term of the Lease [was] therefore ended.” Finally, after additional exchanges of letters and information, DiBella notified Fiumara on July 1, 2002 that it was not consenting to the alterations, that Fiu-mara’s default “continue[d] uncorrected,” that the lease “ha[d] terminated,” and that any further payments by Fiumara would be accepted “for use and occupancy only and not as rent.” This action was commenced six weeks later.
At the bench trial, DiBella presented evidence that the alterations were structural in nature and were being done without his consent, and that the alterations might affect the zoning of the property and its valuation for real estate tax purposes. After trial, the judge made extensive findings of fact and rulings of law which included the determination that Fiumara had indeed breached the parties’ lease by failing to obtain DiBella’s consent for the alterations. However, the judge concluded that because this was not a “material breach,” there was “no proper basis for termination” of the lease, and he ordered judgment for Fiumara. In so doing, he found that any injury to DiBella because of increases in real estate taxes or a change in the zoning status of the property was “speculative” and that DiBella could be adequately compensated for any such injuries by money damages.
On appeal, DiBella argues that the judge erred in not evicting Fiumara after finding that he had breached the terms of the lease.[2] It is clear that the trial judge found that Fiumara breached Paragraph 10 of the lease. However, the judge applied the factors set forth in the RESTATEMENT (SECOND) OF CONTRACTS, §241 (1981)[3] and concluded that the breach was not material. "While we recognize that “[w]hether a breach is material or immaterial normally is a question for the... [fact finder] to decide,” Lease-It, Inc. v. Massachusetts Port Auth., 33 Mass. App. Ct. 391, 396 (1992), we must reverse the trial court’s judgment. In our view, the case did not turn on the characterization of the breach as material or immaterial. A finding *18 that the breach was immaterial did not end the inquiry. Such a finding signified only that DiBella was not excused from further performance under the lease. Id. However, DiBella did continue to perform. Fiumara remained in possession of the premises. All that DiBella did was exercise his legal rights under the lease and the laws of summary process.
The issue here is instead whether the lessee will be relieved of the consequences of his breach, however it is characterized. As stated in Kaplan v. Flynn, 255 Mass. 127 (1926),
Equity relieves against a forfeiture where no real fault is committed, or the breach is induced or waived by conduct, as well as when by accident or mistake there has been a breach of some collateral covenant, such as to repair or insure, and where the lessor may be placed in the same position as if the breach did not occur, by an award of damages or otherwise.
Id. at 131. However, even a willful breach will be overlooked if the lessor was not prejudiced and the lessee “demonstrated good faith in its subsequent substantial compliance.” Howard D. Johnson Co. v. Madigan, 361 Mass. 454, 458-459 (1972). In Howard D. Johnson Co., the lessee’s report of gross sales figures, which would be used to fix a percentage rent, was not properly signed and certified as required by the lease. When notified of its breach, the lessee provided monthly reports and an annual statement within two months. Moreover, the lessor never exercised his right to inspect the lessee’s company books and records, and even if the report had been submitted in the required form, “no further rent would have been due.” Id. at n.2.
On the other hand,
where the conduct of a lessee has been such as not to commend itself to a court of equity or where the circumstances of a particular case are such that the granting of relief would impose an unjust and unreasonable hardship on the lessor, then a forfeiture has not been set aside.
Eno Sys. Inc. v. Eno, 311 Mass. 334, 338 (1942). In Finkovitch v. Cline, 236 Mass. 196 (1920), the Supreme Judicial Court found it inappropriate to grant relief from eviction to a tenant because the tenant was “asking the court to guard him against the legal consequences of his own willful act committed in conscious violation of his Agreement.” Id. at 200. The Court stated: “Equity does not afford its shield against the natural consequences of contumaciously wrongful conduct.” Id. Finally, some significance will be attached to whether the lease provided for termination in the event the covenant at issue was breached. Barry v. Frankini, 287 Mass. 196, 199-200 (1934), cited in Worcester Heritage Society, Inc. v. Trustell, 31 Mass. App. 343, 345 (1991) (“Ordinarily equity will not set aside a contract... on the sole ground of nonperformance ... of one ... [of the] agreements therein contained, in the absence of an agreement for termination upon breach by such nonperformance, where the breach is not of such a material and substantial nature as to excuse the party ... from proceeding with the contract, but will leave the party suing to his remedy by way of damages [emphasis supplied].”).
Clearly, the Massachusetts cases discussed above echo many of the concepts contained in the RESTATEMENT OF CONTRACTS provision relied upon by the trial judge. The RESTATEMENT, however, merely sets out a number of factors to be weighed in determining the materiality of a breach. On the other hand, the case law details specific requirements that must be satisfied before a lessee will be able to avoid termination as a consequence of his breach. In circumstances that are undisputed, those requirements were not satisfied in this case as a matter of law for three reasons. First, the lease contained a provision that put Fiumara on notice *19 that he faced termination of the lease if he breached the covenant dealing with alterations. Second, after he willfully breached the covenant in question, Fiumara made no effort to comply with the lease by stopping the work and restoring the premises to their original condition. Finally, if the alterations were made, there was no guarantee that DiBella could have been placed in the same position he would have been in had the breach not occurred.
Paragraph 17 of the lease not only alerted Fiumara that his default “in the observance of any of... [his] covenants” could result in termination, but also provided him with a thirty day window of opportunity to correct any default. It was very clear that this provision applied to covenants other than the obligation to pay rent. Moreover, even if the default was not “susceptible to cure” -within that thirty day period, Fiumara would have been given an “additional reasonable period of time as [was] necessary.” Approximately three months elapsed between the time DiBella first notified Fiumara that he was in default and the time this summary process action was filed. While Fiumara offered to pay any additional real estate taxes occasioned by the alterations, he never indicated during this period that he would stop the construction work, he did not return the premises to their original condition, and he never asked for further time to do so. Instead, like the lessee in Healthco, Inc. v. E & S Realty Associates, 400 Mass. 700, 702 (1987), he “presented ... [DiBella] with a fait accompli and sought... [his] ratification of this action.” However, in doing so, he “deprived” DiBella “of a right which was accorded to [him] by the contract....” Id. at 703.[4]
Finally, we agree with the trial judge that the injury to DiBella is speculative. Therein, however, lies the problem. This is not a situation where the lessor could readily “be placed in the same position as if the breach did not occur.” Kaplan v. Flynn, supra. See also Paeff v. Hawkins-Washington Realty Co., 320 Mass. 144, 148 (1946). In this regard, the cases involving acceleration of rent provisions are instructive by analogy. As noted in Commissioner of Insurance v. Massachusetts Accident Co., 310 Mass. 769 (1942), a liquidated damages clause in such a case would not be enforced where a breach “resulted] in a loss which could be accurately determined and would be inconsiderable in comparison with the amount required by the lease to be paid....” Id. at 771. See also Cummings Properties, LCC v. Empire Technologies, Inc., 2002 Mass. App. Div. 84, 86 n.2. Similarly, termination of this lease should not be avoided unless the calculation of damages is a relatively simple mathematical task. For example, in Howard D. Johnson Co., supra, once the sales figures were known, the additional rent due could easily be calculated by taking five percent of the sales of $370,000.00. Other examples can be found in the lease in this case. If Fiumara did not maintain the landscaped areas (Paragraph No. 9), DiBella could have had the work done, and the amount of that bill would be the damages for the breach. If Fiumara failed to maintain the level of insurance required by Paragraph No. 15, DiBella could have secured the insurance, and his premium would be the damages.
Conversely, any damages occasioned by the alterations of the building undertaken without DiBella’s consent would involve a much more complicated and uncertain assessment. While any increase in the real estate taxes might be readily determined, the portion attributable to the alterations might not be. More significantly, an increase in the valuation of the property would have an impact on future taxes due after this lease has ended. To make that determination would require a prediction about future tax rates in Peabody and the length of time DiBella would continue to own the property. Moreover, the trial judge’s view that “losses resulting from adverse zoning decisions are measurable and may be compensable in *20 subsequent actions” was overly optimistic. Even if they were measurable, they would not be readily or easily measured since the impact of a zoning change could also be anticipated to extend long after the relationship of these parties had ended. To force DiBella to rely on future litigation, with all its attendant uncertainties, would also impose an “unreasonable hardship.” Paeff v. Hawkins-Washington Co., supra. Finally, we recognize that termination of this lease presumably will have a severe impact on the lessee. This arrangement was part of the sale of a business and the transfer of a liquor license. However, Fiumara had it within his power to avoid this whole problem by stopping construction and putting the property back to its original condition. He, not DiBella, must bear the consequences of his decision not to do so.
Accordingly, the judgment for the defendant is reversed and judgment is to be entered for the plaintiff for possession.
So ordered.

 Although DiBella did not file any Mass. R. Civ. P., Rule 64A, requests for rulings of law in the trial court, the issue is properly before us on appeal. The reason is that the trial judge’s “thought process” in entering judgment for Fiumara was “fully articulated” in his findings and rulings. Lynn v. Nashawaty, 12 Mass. App. Ct. 310, 315 (1981). See also Gonsalves v. European Engineering Sales & Service, Inc., 2001 Mass. App. Div. 231, 232.

 Those factors are: “ (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.”

 Healthco involved a breach of a covenant not to assign a lease without the lessor’s consent.