Fremont-Smith, Thayer, J.
Based on all of the credible evidence at trial, the Court finds and rules as follows.
Plaintiff Eldamar is a real estate development company which, on May 22,2006, entered into a purchase and sale agreement (“P&S”) with the defendants for the purchase of real estate in Boxborough for the development of a residential subdivision.
The Eldamar-Sweeney P&S provided that Eldamar would obtain the permits and approvals necessary to build a subdivision on a combined parcel consisting of the Sweeney Land and about 22 acres of adjoining land owned by Harvey and Douglas Trefiy. Once those permits and approvals were in place, the Sweeneys would grant Eldamar a perpetual easement allowing Eldamar to build a proposed subdivision access road over the Sweeney Land.[1] Once the subdivision road was completed, Eldamar would buy the Sweeney Land for $1,540,000, or $308,000 per lot. Rider A to the P&S specified that the “Closing Date” for Eldamar’s purchase of Sweeney’s land was: the earlier of (i) the date eight months following the Subdivision Approval Date, or (ii) the date that the subdivision roadway has been *64 bonded with the Town and the lots have been released from any subdivision covenant by the Town. The closing date for provision of the right of way was one day after the subdivision approval date, which the parties agree turned out to be November 14, 2007.
After the expenditure of over $300,000 in expenses pursuing the development, including engineering and permitting costs and the payment of the taxes on other property acquired for the development, by November 14, 2007 Eldamar had obtained all of the necessary permits and demanded that defendants provide the agreed easement to construct the road.
In the months leading up to obtaining subdivision approval, Eldamar had became concerned with the softening of the residential real estate market and, in August 2007, had met with Michael Sweeney and his friend and consultant Michael Lionetta with a request to restructure the parties’ agreement, including a reduction in the purchase price for the Sweeney property. This Sweeney refused to do. The Court does not credit Sweeney’s testimony contradicted by Kaulbach, that, at that meeting, Kaulback threatened that he would not go forward with the P&S on its original terms and would sue Sweeney unless Sweeney agreed to a reduction in price.[2] While Kaulback admittedly did seek a reduction in price, all of Eldamar’s subsequent communications and actions discussed below evince a continued intention to consummate the deal, with or without the requested price reduction.
Thus, Eldamar continued to spend money to obtain the final permits obtained on November 13, 2007. Shortly before obtaining the permits moreover on October 15, 2007, Eldamar executed a purchase and sale agreement with a developer with which it had worked successfully in the past, Kendall Homes, pursuant to which Kendall Homes agreed to buy eleven of the 15 lots for $3,355,000 (at an average lot price of approximately $305,000), and Kendall Homes agreed to advance Eldamar $450,000 to finance the construction of the road.
As noted above, by November 13, 2007, Eldamar had obtained Planning Board approval, the necessary Conservation Commission Order of Conditions, and approval by the Boxborough Zoning Board of Appeals for the subdivision (October 23, 2007). Accordingly, pursuant to Rider A and §7 of the May 2006 P&S, the Sweeneys were obligated to tender, as of November 14, 2007, the “Grant of Construction and Right of Way Easement” containing the terms agreed to in the May 2006 P&S.
On December 4, 2007, the Sweeneys’ attorney tendered an easement to Eldamar, stating that “We understand that you have been successful in obtaining subdivision approval.” Enclosed with the letter was a “Grant of Temporary Construction Easement” executed by the Sweeneys. This was not the perpetual easement required by the terms of the May 2006 P&S. The instrument was titled “Grant of Temporary Construction Easement” (emphasis supplied) and by its terms would have given Eldamar only a temporary easement and right of access to construct the subdivision roadway which would have terminated and expired. This nonconforming easement also included other provisions that were not in conformity with the May 2006 P&S, including indemnification and other obligations not contained in the P&S.
On December 11, 2007, Eldamar, in writing, rejected this nonconforming easement, and while reserving its rights, requested that the Sweeneys convey the Perpetual Easement they had agreed to convey, with the plain, unambiguous and simple terms recited in the May 2006 P&S.
While rejecting the nonconforming easement and reserving its rights, Eldamar also continued to work on the project in the belief that the Sweeneys would comply with the P&S so as to permit the project to go forward. Thus, Eldamar continued to pay for septic design work, to seek road construction quotes, and to pay the taxes on the Trefiy land.
By letter dated January 3, 2008, Sweeneys’ attorneys tendered a second easement, entitled “Grant of Construction and Right of Way Easement.” This easement, too, failed to include or use the plain, unambiguous and simple language the parties agreed to in the May 2006 P&S but contained terms that were not agreed to in the P&S, including a broad indemnification provision. It also contained a restoration obligation, which was not agreed to in the P&S, and was also characterized as a “temporary construction easement” which would become permanent and perpetual only “upon completion of the subdivision roadway.”
On January 11, 2008, Eldamar, in writing, rejected this second nonconforming easement, and requested that the Sweeneys convey the perpetual easement they had agreed to convey with the plain, unambiguous and simple terms recited in the P&S. Eldamar’s letter also again expressly reserved Eldamar’s rights.
After rejecting the second nonconforming easement, Eldamar continued to work on the project in the belief that the Sweeneys would eventually tender a conforming easement so that the project could go forward. Eldamar continued to pay for septic design work, seek road construction quotes, and pay the taxes on the Trefry land.
After Eldamar rejected the second nonconforming easement, a meeting was held in February 2008 to discuss a settlement of the easement dispute and a modification of the May 2006 P&S. The meeting was attended by Kaulbach for Eldamar, Michael Sweeney, Michael Lionetta (Sweeney’s friend and consultant) and attorney Cathy Netburn, counsel to the Sweeneys. Kaulbach and Lionetta each testified that they left the meeting with the belief that the parties had reached an agreement in principle or, as Lionetta put it, “we were all on the same page.”[3] Following the meeting, Eldamar circulated a “P&S Amendment Outline” re- *65 fleeting the discussions which did not envision any reduction by Sweeney in the purchase price such as Kaulbach had requested in the summer of 2007 and which Sweeney had rejected. Rather, the purchase price for the lots remained $1,540,000, or an average of $308,000 per lot. The proposed amendment provided the Sweeneys some additional security for Eldamar’s performance, and that Sweeney would provide a “clean easement.”
The proposed modification to the P&S, however, was never executed. On February 25, 2008, after receiving no response regarding the proposed amendment, Kaulbach emailed the Sweeneys’ counsel, Cathy Netburn, asking for a response, and indicated Eldamar’s willingness to proceed with the P&S whether or not the modifications were accepted. In response, Netburn called Kaulbach and said the Sweeneys were retaining new counsel.
On February 29, 2008, Kaulbach was contacted by the Sweeneys’ new counsel, attorney Richard Gallogly, who said that he would be forwarding a draft of an amended purchase and sale agreement. Kaulbach responded by forwarding to Gallogly the amendment outline Kaulbach had previously circulated, saying “we simply want to know whether we have a deal or not.”
On March 5, Gallogly forwarded to Kaulbach a draft amendment to the May 2006 P&S which deviated substantially from the amendment outline and stated that the Sweeneys would not provide the Perpetual Easement in conformance with the May 2006 P&S.
On March 6, 2008, Eldamar notified Michael Sweeney in writing Eldamar was “no longer willing to hold in abeyance the enforcement of our clear contractual rights (particularly in light of our belief that you reneged on your own amendment proposal),” and, in light of what plaintiff understood to have been Gallogly’s indication that defendants “would in no case furnish the perpetual easement as is plainly mandated by the agreement,” the letter notified defendants that they were in default of the P&S, and that “we will no longer accept as compliant any easement from you.”
Notwithstanding the March 6, 2008 notice of default, on March 11 the Sweeneys’ attorney tendered a third nonconforming easement. It, too, altered the plain, unambiguous and simple language of the Perpetual Easement that the parties had agreed to in the P&S. Instead of using the language and the terms the Parties had agreed to use, this third nonconforming easement provided that the “Grantor shall be deemed to have granted to the Grantee the perpetual and non-exclusive right and easement. . . [only] . . . upon completion of the roadway and the recording of a deed at the Middlesex South Registry of Deeds evidencing the conveyance of Lots 2, 3, 4, 15 and 16 as shown on the plan from Grantor to Grantee.” There was, however, no condition in the P&S requiring the Sweeneys to convey lots to Eldamar before Eldamar should receive the agreed-upon Perpetual Easement.
Eldamar rejected the third nonconforming easement, once again reserving its rights, and brought this lawsuit for damages resulting from defendants’ breach of contract.[4] Only as a result of this Court’s award of summary judgment to Eldamar for breach of contract did defendants, as then ordered by the Court, promptly provide the plaintiff with a conforming easement, which plaintiff rejected.
The Court finds and rules that the Sweeneys’ failure to provide Eldamar with a conforming easement within a reasonable time after it was due and before Eldamar’s patience justifiably ran out, was a material breach of the P&S agreement. A breach of contract is “material” when the breach is “of an essential and inducing feature of the contract.” Lease-It, Inc. v. Massachusetts Port Auth., 33 Mass.App.Ct. 391, 396 (1992). A material breach has also been described as “a substantial breach going to the root of the contract . . .” Aerostatic Eng. Corp. v. Szczawinski, 1 Mass.App.Ct. 141, 145 (1973).
The perpetual easement was a central and essential provision of the May 2006 P&S. Without the perpetual easement, Eldamar could not construct the subdivision road. Without the road, it could not realize the value of the 15 subdivision lots for which it had obtained development approval. Without the easement, Eldamar could not perform its profitable contract with Kendall Homes to sell Kendall Homes eleven lots for $3,350,000 or realize the valuable rights to the remaining four lots. Moreover, while defendants did belatedly proffer a conforming easement after being ordered by this Court to do so, the timing of the Sweeneys’ performance was a material part of the May 2006 P&S. The May 2006 P&S provided that it “is agreed that time is of the essence.” See Section 7. By definition, where the parties agree that “time is of the essence,” then timing of performance is material. The whole point of expressly including the phrase “time is of the essence” in a P&S is to reflect in writing that the parties agree that the time of performance is material, not just the performance itself. That is what the phrase necessarily means — timing is material. Williston on Contracts, §46.3 (4th Ed. 1995).
Although Eldamar gave defendants several opportunities to proffer a conforming easement after the agreed time of performance, it never waived its rights to receive the perpetual easement, or waived the Sweeneys’ obligation to timely tender the perpetual easement. “[W]here waiver is not explicit, it must be premised on ‘clear decisive and unequivocal conduct.’ ” KACT, Inc. v. Rubin, 62 Mass.App.Ct. 689, 695 (2004), quoting Glynn v. Gloucester, 9 Mass.App.Ct. 454, 462 (1980). Here it is undisputed that Eldamar repeatedly, expressly and unequivocally reserved all of its rights and remedies: On December 11, in rejecting the First Nonconforming Easement, Eldamar stated *66 that, “we must necessarily reserve all our rights." When Eldamar rejected the Second Nonconforming Easement on January 11, 2009, it stated unequivocally once again that “we are not waiving any of our legal rights or remedies with respect to this matter.” On March 6, 2008, shortly before the Sweeneys tendered the Third Nonconforming Easement, once again Eldamar expressly stated that it “reserved all of our ríghts and equitable remedies attributable to your default." A reservation is the opposite of a waiver. The entire purpose of a “reservation of rights” is to allow a parly to attempt a settlement without fear of losing its rights by waiver. The law does not penalize a party for trying to resolve a matter short of litigation, particularly where, as here, it has expressly, repeatedly and unequivocally reserved its rights over the course of the parties’ talks. Only after defendants’ delay had become totally unreasonable and defendants’ counsel had indicated they would never comply, did plaintiff declare a material breach.
Because the Sweeneys’ breach was material, Eldamar was excused from further performance. “It is well established law that following a material breach of a contract by one party, the other party is excused from performance.” HRPT Advisors, Inc. v. MacDonald, Levine, Jenkins & Co., P.C., 43 Mass.App.Ct. 613, 626 n.16 (1997); Lease-It, 33 Mass.App.Ct. at 397; Ward v. American Mut. Liab. Ins. Co, 15 Mass.App.Ct. 98, 100 (1983). Eldamar was thus not obligated to accept the defendants’ belated Court-ordered proffer of a conforming easement.
“The long-established general rule for breach of contract recoveiy... is that the wronged party should receive the benefit of his bargain, i.e., be placed in the same position as if the contract had been performed.” VMark Software, Inc. v. EMC Corp., 37 Mass.App.Ct. 610, 611 n.2,(l994). “The rule of damages in an action for breach of contract is that the plaintiff ‘is entitled in general to damages sufficient in amount to compensate him for the loss actually sustained by him, and to put him in as good position financially as he would have been in if there had been no breach.’ ” Boylston Hous. Corp. v. O'Toole, 321 Mass. 538, 562 (1947), quoting from Bucholz v. Green Bros. Co., 272 Mass. 49, 54 (1930).
Eldamar suffered damages from the Sweeneys’ breach of the May 2006 P&S in the amount of $1,431,906, calculated as follows: The Sweeneys’ breach prevented Eldamar from realizing the value of its contract with Kendall Homes, and selling eleven lots to Kendall Homes, for $3,355,000, and from obtaining rights to and realizing the value from the remaining four lots, which had a total value of $1,220,000,[5] for a gross price of $4,575,000. From this must be deducted those further expenses that Eldamar would have been required to expend in order to create the eleven lots, which are the following: the cost of completing the road ($795,000); the cost of the Trefry land ($577,344); interest that would have been due to Trefiys ($15,750); the cost of the Sweeney land ($ 1,540,000); additional interest on amounts Eldamar anticipated borrowing, including interest that would have been owed Kendall for the road financing ($100,000); remaining engineering expenses ($40,000); and maintenance and other miscellaneous costs that Eldamar anticipated incurring until the lots were sold ($75,000). When the total of these costs ($3,143,094) are subtracted from the lost gross profit of $4,575,000 plaintiffs loss of net profit was $1,431,906.
ORDER FOR JUDGMENT
Accordingly, judgment shall be entered in favor of the plaintiff Eldamar Development Company, LLC against Michael and Marilyn Sweeney in the sum of $1,431,906 plus interest and costs.

 The P&S provided that the Sweeneys were obligated to grant a “Construction and Right of Way Easement which gives Buyer the right and easement to enter onto the Premises Right of Way (as defined in Rider A) for the purposes of constructing the subdivision roadway and any and all subdivision infrastructure (e.g. fire cistern, detention basins) and which gives Buyer, its heirs, successors and assigns, the perpetual right and easement to pass and re-pass over, under and upon any portion of the subdivision roadway, once completed to binder coat, located on the Premises, for all purposes which streets and ways are commonly used in the Town of Boxborough. It is agreed that time is of the essence of this Agreement.”

 Lionetta’s testimony as to what happened at the meeting was equivocal, contradictory and ultimately unconvincing.

 Although listed as a witness by defendants and available to testify, defendants did not call Netbum as a witness regarding what transpired at the meeting.

 Eldamar sought damages for breach of contract but did not seek specific performance. It also alleged a violation of M.G.L.c. 93A, which it has now waived.

 I credit Black’s testimony that Kendall remained willing and able to abide by the terms of its P&S with Eldamar and that Black, an experienced home builder, remained willing to carry out Kendall’s P&S obligations and to have Kendall purchase the four remaining lots, along with the other eleven, for the same $305,000/lot price.